Rockingham
No. 89-560

EUGENE NIEDZIELSKI, JANE DOE & a.

v.

ST. PAUL FIRE & MARINE INSURANCE COMPANY

April 23, 1991

*Burns, Bryant, Hinchey, Cox & Schulte P.A.*, of Dover (*Paul R. Cox* and *Sharon A. Spickler* on the brief, and *Mr. Cox* orally), for the plaintiffs, Jane Doe and Mary Doe.

*Yakovakis, McDonough & Lindh P.A.*, of Manchester (*Brian T. McDonough* on the brief and orally), for the defendant.

THAYER, J.    The plaintiffs Mary Doe and Jane Doe appeal a declaratory judgment entered by the Superior Court (*Nadeau,* J.) in favor of the defendant, St. Paul Fire & Marine Insurance Company (St. Paul), the provider of professional liability insurance to Eugene Niedzielski, D.D.S., the defendant in the underlying tort case. Dr. Niedzielski brought the original declaratory judgment action claiming insurance coverage for events that occurred on August 28, 1981, at his dental office. Jane Doe and her mother, Mary, joined as plaintiffs in that action. The trial court found that St. Paul was not obligated to cover the insured, because his alleged sexual assault upon Jane Doe did not arise out of the rendition of professional services, as required by the insurance policy between St. Paul and Niedzielski. The insured has taken no part in this appeal. The Does now argue that the alleged assault is covered by the professional liability policy, because Jane Doe's damages arose as a result of her presence in the insured's office for the purpose of receiving professional services. In the alternative, the plaintiffs contend that the language contained in the policy is ambiguous and must, therefore, be construed in their favor according to New Hampshire law. *See Trombly v. Blue Cross/ Blue Shield,* 120 N.H. 764, 770–72, 423 A.2d 980, 985 (1980). We disagree and therefore affirm.

For the purposes of this declaratory action, the parties stipulated to the following facts. Mary Doe took her ten-year-old daughter, Jane, to the insured's dental office on August 28, 1981, in order to have Jane's decayed tooth repaired. A dental assistant brought Jane to an examination room and then left the office for her lunch break. Once the dental assistant left the office, the insured entered the examination room where Jane was sitting, shined a light into Jane's eyes and placed a folded towel over her face so as to obstruct her vision. The insured then sexually assaulted her. Afterwards, he took x-rays and placed a filling in Jane's tooth.

After leaving the dentist's office, Jane informed her mother of what had happened, and the Exeter police were notified. The Does filed a civil tort action against Niedzielski in September of 1984, and he, in turn, filed a declaratory judgment action against his professional liability insurance provider, St. Paul. The trial court found that the insurance policy in question contains no exclusion for criminal or intentional acts, but "unambiguously" limits coverage to occurrences that "arise out of the performance of or failure to perform professional services." The court also found that the insured's conduct "did not arise out of the rendition of professional services." Accordingly, the court ruled that the insured's professional liability insurance was intended only to cover routine services typically associated with dentistry, not intentional acts such as the sexual assault that occurred in this case.

On appeal we are asked to determine the meaning and scope of the professional liability policy. The policy, in part, obligates St. Paul:

> "To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages arising out of the performance of professional services rendered or which should have been rendered, during the policy period, by the Insured or by any person for whose acts or omissions the Insured is legally responsible . . . ."

In order to determine if the plaintiff's damages are those "arising out of professional services rendered or which should have been rendered," we must determine the plain meaning of the words "professional services."

■ Neither State statutes nor judicial decisions in New Hampshire have addressed the precise question raised here. When determining whether the damages arose out of the rendering or failure to render professional services, the plaintiffs urge us to look, not just to the type of health care provided, but to the gravamen of the com-

plaint. The great weight of authority, however, persuades us to adopt the contrary view, as expressed in *Marx v. Hartford Acc. & Ind. Co.*, 183 Neb. 12, 157 N.W.2d 870 (1968), that we must look to the nature of the tortious act and interpret the plain meaning of the terms of the policy. In *Marx*, the Nebraska Supreme Court defined a professional act or service as "one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill . . . [that] is predominantly mental or intellectual, rather than physical or manual." *Id.* at 14, 157 N.W.2d at 872. Granted, the factual setting in *Marx* is distinguishable from the circumstances now before us, but the thrust of *Marx* and its progeny is that when a court is determining the coverage of a professional liability insurance policy, it must examine the nature of the act performed, rather than the title or professional character of the actor. *Id.*; *see Harad v. Aetna Cas. and Sur. Co.*, 839 F.2d 979, 984 (3d Cir. 1988); *Curtis Ambulance v. Shawnee Cty. Bd. of Cty. Comm'rs*, 811 F.2d 1371, 1379–80 (10th Cir. 1987); *Bank of California, N.A. v. Opie*, 663 F.2d 977, 981 (9th Cir. 1981); *Horn v. Burns and Roe*, 536 F.2d 251, 255 (8th Cir. 1976); *St. Paul Fire & Marine Ins. Co. v. Asbury*, 149 Ariz. 565, 566, 720 P.2d 540, 541 (Ct. App. 1986); *Hirst v. St. Paul Fire & Marine Ins. Co.*, 683 P.2d 440, 444 (Idaho Ct. App. 1984); *Vigue v. John E. Fogarty Memorial Hosp.*, 481 A.2d 1, 3 (R.I. 1984); *Standard Fire Ins. Co. v. Blakeslee*, 54 Wash. App. 1, 9, 771 P.2d 1172, 1176, *review denied*, 113 Wash. 2d 1017, 781 P.2d 1320 (1989). Stated another way, the question of professional liability coverage is determined, not by the professional status of the actor, but by the nature of the tortious act.

In examining the nature of the insured's actions, it is difficult to envision how they can be characterized as professional acts for the purposes of applying the provisions of the insurance policy. The plaintiffs contend that the insured had the opportunity to commit the assault because Jane was in his office to receive professional services. Their argument, in other words, is that the professional liability policy should cover the plaintiffs' injuries, because the insured was holding himself out as a professional health-care specialist when he committed the assault. Nevertheless, the scope of professional services does not include all forms of a medical professional's conduct simply because he or she is a doctor or dentist. Jane Doe's physical presence in the insured's office does not justify a characterization which would label every act occurring in that office a professional service or failure to provide a professional service.

Those cases that do hold the insurance carrier liable to provide insurance coverage for an insured's sexual assault upon a patient are

factually and logically distinguishable from the case before us. For instance, the plaintiffs cite a number of cases that involve therapists who engaged in sexual relations with their patients by manipulating the patient's emotional reactions. In these cases, the therapists allegedly exploited the intimate nature of the relationship between therapist and patient by fueling the patient's emotional and physical attractions to the doctor for the purpose of obtaining sex. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Mitchell,* 164 Ga. App. 215, 296 S.E.2d 126 (1982); *Vigilant Ins. Co. v. Kambly,* 114 Mich. App. 683, 319 N.W.2d 382 (1982); *L.L. v. Medical Protective Co.,* 122 Wis. 2d 455, 362 N.W.2d 174 (1984), *review denied,* 122 Wis. 2d 783, 367 N.W.2d 223 (1985). The plaintiffs in these cases alleged that their injuries were causally connected to the insured's failure to properly treat an emotional reaction that is often experienced by patients undergoing psychiatric treatment. *See Mitchell, supra* at 216–17, 296 S.E.2d at 127; *Zipkin v. Freeman,* 436 S.W.2d 753, 763 (Mo. 1968); *Medical Protective Co., supra* at 460–63, 362 N.W.2d at 177–78. In one case, the therapist allegedly persuaded the victim that the act of having sex was part of her prescribed treatment. *Vigilant Ins. Co., supra* at 685, 319 N.W.2d at 384. The inappropriate manipulation of the so-called "transference phenomenon" is obviously very different from the circumstances involved in the case before us. Nowhere do the plaintiffs allege that the insured failed to treat a condition which made Jane susceptible to a sexual assault by the insured. Nor does this case involve a patient who was led to believe that sexual contact was part of her treatment.

Similarly, other cases that have allowed coverage for sexual assault committed by professional health-care providers involve factual circumstances that are very different from those that surround the case before us. Typically, courts have found coverage under a professional liability policy only where the sexual contact with the patient was related to, or "intertwined with, and inseparable from, [the] services provided." *Asbury,* 149 Ariz. at 567, 720 P.2d at 542. In *Asbury* the defendant assaulted his patients while performing routine gynecological examinations. The Arizona Court of Appeals found that the doctor's tortious actions were covered under the language "providing or withholding of professional services." *Id.* at 566–67, 720 P.2d at 541–42. Nevertheless, the court limited its holding to instances where the sexual abuse was related to the treatment being sought, and cited *Hirst* as an example of a case where the tortious conduct was not covered due to the absence of this relationship. *Id.* at 567, 720 P.2d at 542.

In *Hirst* the patient was being treated for a hand injury when the sexual assault occurred, and even though the plaintiff was drugged into submission, the court found that the act did not constitute "professional services" under the applicable provision of the insurance contract. 683 P.2d at 444. Looking to the act which harmed Jane Doe, we see no relation between the dental treatment she sought and the sexual assault which occurred. Dentistry does not necessitate or in any way involve sexual contact between a dentist and his patient. *Blakeslee*, 54 Wash. App. at 9, 771 P.2d at 1176.

■ Moreover, the one case cited by the plaintiffs that does allow insurance coverage for a sexual assault committed during the course of a dental examination involves very different policy language than the language in question in this case. In *Public Service Mut. Ins. Co. v. Goldfarb*, 442 N.Y.S.2d 422, 425 N.E.2d 810 (1980), the dentist's professional liability policy specifically covered claims based upon "assault, slander, libel [or] undue familiarity." *Id.* at 425, 425 N.E.2d at 813. The court found that the language clearly indicated an intent to pay for damages arising out of inappropriate physical contact occurring during the course of dental treatment. *Id.* at 425–26, 425 N.E.2d at 813. The court characterized its interpretation of the insurance policy as a "purely contractual matter, absent any consideration of public policy." *Id.* Niedzielski's professional liability policy contained no such language. Thus, when we view the claim before us in a purely contractual light, it seems clear that the parties neither anticipated nor intended that an intentional sexual assault committed by the insured would be covered under this policy. Therefore, Niedzielski's actions do not constitute "professional services," and are not covered under the insurance policy in question.

■■ The plaintiffs contend, in the alternative, that the phrase "damages arising out of" lends itself to a broad construction which encompasses, within the coverage of the insured's professional liability policy, any damages which originate from the seeking or rendition of professional dental services. We disagree. "'We construe the language of an insurance policy as would a reasonable person in the position of the insured based on a more than casual reading of the policy as a whole.'" *Curtis v. Guaranty Trust Life Ins. Co.*, 132 N.H. 337, 341, 566 A.2d 176, 179 (1989) (quoting *Haley v. Allstate Ins. Co.*, 129 N.H. 512, 514, 529 A.2d 394, 396 (1987)). Therefore, we construe the phrase "damages arising out of" to mean damages which "originate from a specified source." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 117 (1961). The specified source out of which

damages must arise, according to the terms of the insurance policy, is professional services rendered, or which should have been rendered. As our above discussion indicates, sexual assault does not fall within the meaning of professional dental services. Thus, the plaintiffs' damages did not arise out of the rendition of professional services, or lack thereof.

Additionally, the plaintiffs argue that the phrase "arising out of" should receive the same broad construction it received in the context of workers' compensation cases. We find this analogy to be meritless. Whether an injury arises out of, or is related to, employment for the purposes of determining a workers' compensation claim has no bearing upon the question of whether tortious conduct arises out of the performance of professional services.

■■ Finally, the plaintiffs correctly note that ambiguities in insurance policies are construed against the insurer. *Trombly*, 120 N.H. at 770–72, 423 A.2d at 985. However, the trial court did not err when it found that there was no ambiguity in the language of the insured's professional liability policy. Reasonable persons would not define "professional services" as including either sexual contact or assault between a dentist and his patient. *See Spaulding v. Concord Gen. Mut. Ins. Co.*, 122 N.H. 515, 516, 446 A.2d 1172, 1173 (1982). "We will not . . . create an ambiguity simply to resolve it against the insurer." *Haley, supra* at 514, 529 A.2d at 396. Moreover, we will not apply the *Trombly* rule "'so as to create coverage where it is clear that none [was] intended.'" *Curtis, supra* at 342, 566 A.2d at 179 (quoting *Robbins Auto Parts, Inc. v. Granite State Ins. Co.*, 121 N.H. 760, 764, 435 A.2d 507, 509 (1981)). "The plaintiffs have attempted to create an ambiguity where none exists, but where as here, 'the policy terms are clear and unambiguous, an insured may not reasonably expect coverage.'" *Curtis, supra* at 343, 566 A.2d at 179 (quoting *State Farm Auto Ins. Co. v. Cabuzzi*, 123 N.H. 451, 455, 462 A.2d 121, 131 (1983)). Thus, we hold that the policy language in this case does not create an ambiguity which might affect the insured's reasonable expectations, nor are there any public policy arguments which persuade us to deviate from the plain meaning of that language.

■■ Under New Hampshire law the burden of proving that no insurance exists rests with the insurer. RSA 491:22-a; *Laconia Rod & Gun Club v. Hartford Acc. & Indem. Co.*, 123 N.H. 179, 182, 459

148

A.2d 249, 250 (1983). We hold that the trial court properly found that the defendant, St. Paul, has met that burden. Accordingly, we affirm.

*Affirmed.*

HORTON, J., did not sit; the others concurred.