STENTON HALL NURSING & REHA-
BILITATION CENTER and Beverly
Enterprises—Pennsylvania, Inc., Peti-
tioners,

v.

MEDICAL PROFESSIONAL LIABIL-
ITY CATASTROPHE LOSS
FUND, Respondent.

Commonwealth Court of Pennsylvania.

Argued June 4, 2003.

Decided June 27, 2003.

Reargument and or Reconsideration
Denied Aug. 18, 2003.

Marc A. Moyer, Harrisburg, for petitioners.

Zella Smith Anderson and Tawny K. Mummah, Harrisburg, for respondent.

BEFORE: COLINS, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY President Judge COLINS.

Stenton Hall Nursing & Rehabilitation Center (Stenton Hall) and Beverly Enterprises—Pennsylvania, Inc. (Beverly), a California corporation, petition for review of the June 26, 2002 decision of the Medical Professional Liability Catastrophe Loss Fund (Fund) denying Stenton Hall's request for coverage under the Health Care Services Malpractice Act (Act).[1] We affirm.

Stenton Hall is a skilled nursing facility located in the City of Philadelphia. On January 9, 1999, Chappell Brown (Decedent), an eighty-three-year-old resident of Stenton Hall, died from salmonella poisoning that he contracted while a resident at Stenton Hall.

On March 27, 2000, Jeff C. Brown, Administrator of Decedent's Estate (Plaintiff Brown), filed a civil action in common pleas court against Stenton Hall, its medical and executive directors, and Beverly, Stenton Hall's operating and managing entity. On April 8, 2002, Stenton Hall filed a claim report with the Fund. On June 24, 2002, two months before trial, Stenton Hall tendered its $300,000.00 in basic coverage to the Fund.

On June 26, 2002, after reviewing the record, the Fund informed Stenton Hall that it was denying coverage on the ground that Decedent's death did not arise from any tort or breach of contract involving the *furnishing of medical services*. The Fund further noted that Plaintiff Brown's action alleged that general unsanitary conditions caused Decedent to contract salmonella poisoning and that, therefore, the action does not involve *professional liability* as defined by the Act.

■ Stenton Hall petitions for review of the Fund's rejection of coverage. Our review is limited to a determination of whether the necessary findings of fact are supported by substantial evidence, whether an error law was committed or whether constitutional rights were violated. *Stiffler v. Ins. Comm'r of the Commonwealth of Pennsylvania*, 786 A.2d 296 (Pa. Cmwlth.2001).

Stenton Hall contends that the Fund's denial of coverage is incorrectly based on the erroneous contention that the civil action did not involve the *furnishing of medical services* as contemplated by the Act. In particular, Stenton Hall contends that the Fund completely ignored the plain language of Plaintiff Brown's complaint, the factual underpinnings forming the basis for the action, and the statutory and regu-

1. Act of October 15, 1975, P.L. 390, *as amended,* 40 P.S. §§ 1301.101–1301.1006.

latory requirements governing the operation of long-term nursing care facilities.

## I.

■ Stenton Hall's first argument is that the averments set forth in the complaint in the civil action and the evidence of record establishes that Plaintiff Brown's civil action was based upon inadequate medical and nursing care, which is covered under the Act. In support, Stenton Hall cites paragraphs 31 and 32(a)-(b) of the complaint, which alleged:

31. Defendant Stenton Hall failed properly [sic] to treat, exercise due care, and conform to the standards of reasonable and adequate nursing, convalescent and medical care are treatment of plaintiff's decedent's condition.

32. The negligence of Defendant Stenton Hall consisted of the following:

a. failing to properly care for plaintiff's decedent;

b. failing to prevent Salmonella poisoning of plaintiff's decedent. . . .

Plaintiff Brown's Complaint at 8; R.R. 8a.

Stenton Hall contends that the dietary services it provided to Decedent formed an integral part of the long-term nursing care Decedent received at its facility. Thus, Stenton Hall contends that its alleged failure to provide this critical aspect of Decedent's medical care constituted a breach of the applicable standard of nursing care.

Stenton Hall also cites to the evidence developed in the case. This evidence includes an investigatory report by a neutral expert, Dr. Caroline C. Johnson, a physician and expert in the field of infectious disease for the City of Philadelphia's Division of Disease Control (DDC). In her report, Dr. Johnson stated, *inter alia*, that "acquisition of infection is thought to have occurred on the clinical care unit." DDC Report at 3; R.R. 28a. Specifically, Dr.

Johnson also noted that reusable electronic rectal thermometers were used although no cleaning procedure was followed for these devices. *Id.*

In addition, Stenton Hall, the defendant in the civil action, cites the reports of Plaintiff Brown's two experts, Byron S. Arbeit, an administrative expert in the field of long-term nursing care facilities, and Dr. Michael M. Bergman, an infectious disease specialist. In his report, Mr. Arbeit referred to a number of deficiencies at Stenton Hall, including a mouse infestation, warm refrigerators, raw meat stored with prepared foods, and inadequate sanitizing operations. Mr. Arbeit concluded that Decedent "received substandard and/or inadequate care while a resident of Stenton Hall with respect to: freedom from abuse and neglect; dignity; care-planning; documentation; infection control; nursing services; the right to reside in a safe and sanitary environment, free of pests; the right to receive food which has been prepared and stored in a reasonably clean and safe environment; and, administrative oversight." Arbeit Report at 8; R.R. 45a.

In his report, Dr. Bergman also stated, within a reasonable degree of medical certainty, that Decedent contracted salmonella from the nursing home as a result of its substandard care. Although Dr. Bergman admitted that the exact method by which Decedent contracted salmonella may never be known and that Decedent may have contracted the disease from an outside source of food, the doctor opined that Stenton Hall was still at fault because it was obligated as part of its nursing care duties to protect patients with chronic conditions such as end-stage renal failure from exposure to salmonella infection.

In view of the foregoing, Stenton Hall asserts that the civil action was based on the negligent *furnishing of medical ser-*

vices, i.e., the substandard dietary and sanitary services provided to Decedent, including negligent dietary supervision, which must be considered to be an integral part of the total nursing care provided by Stenton Hall.

Stenton Hall also cites two common pleas court decisions for the proposition that the Act is intended to cover professional negligence, whether falling within advanced medical treatment or common day-to-day operations of a health care facility. In *Rothman v. Sacred Heart Hosp.*, 13 Pa. D. & C.3d 496 (1979), a patient was injured when she slipped and fell on water that leaked from an ice bag used to treat another patient in her room. In finding coverage under the Act, the court determined that furnishing a hospital room comprised part of the health care furnished by a hospital to a patient.

In *Herr v. St. Francis Hosp.*, 9 Pa. D. & C.3d 610 (1978), the court determined that the term "medical services" as used in the Act pertained to the overall care and supervision of a patient. In *Herr*, a psychiatric patient sustained injuries after he pried open a window in an attempt to escape. The court found that where the purpose of the treatment was to address the patient's self-destructive tendencies, the type of confinement prescribed for him, i.e., a room with easily removable windows, was properly considered part of the furnished medical services.

In response to Stenton Hall's arguments, Appellee Insurance Department, Medical Care Availability and Reduction of Error Fund (Department), the successor in interest to the Fund, contends that Plaintiff Brown's allegations do not establish a claim involving *professional liability*, which is required by the Act for coverage. In its decision denying Stenton Hall's claim for coverage, the Fund stated in relevant part that "[r]eview of the informa-

tion submitted demonstrates the allegations in the above-referenced claim do not involve the furnishing of medical services." Fund's Rejection of Coverage; R.R. 34a.

Initially, we note that the Act's purpose is to "make available *professional liability* insurance at a reasonable cost, and to establish a system through which a person has sustained injury or death as a result of tort or breach of contract by a health care provider can obtain a prompt determination and adjudication of his claim and the determination of fair and reasonable compensation." Section 102 of the Act, 40 P.S. § 1301.102 (emphasis added). Section 701(d) of the Act provides in pertinent part:

> There is hereby created a contingency fund for the purpose of paying all awards, judgments and settlements for loss or damages against a health care provider entitled to participate in the fund as a consequence of any claim for *professional liability* brought against such health care provider as a defendant or an additional defendant. . . .

40 P.S. § 1301.701(d) (emphasis added).

"Section 701 clearly limits the CAT Fund's liability to losses as a consequence of any claim for professional liability." *Connolly v. Med. Prof'l Liab. Catastrophe Loss Fund*, 559 Pa. 1, 5, 739 A.2d 104, 106 (1999). Although *professional liability* is not defined in the Act, *professional liability insurance* is defined by Section 103 of the Act as "insurance against liability on the part of a health care provider arising out of any tort or breach of contract causing injury or death resulting from the *furnishing of medical services* which were or should have been provided." 40 P.S. § 1301.103 (emphasis added).

■ Based upon the above definition, "we can reasonably infer that professional liability therefore arises from the provision

of medical services or failure to provide appropriate medical services." *Connolly,* 559 Pa. at 5, 739 A.2d at 106. Although the *Connolly* Court recognized that the Fund is statutorily mandated to pay all awards, judgments, and settlements against a health care provider as a consequence of a claim for professional liability, the Court nevertheless noted that the Act's scope of coverage is limited:

> Section 701(d), however, should not be read so broadly as urged by appellant to include every injury or claim arising as a consequence of the provision of services by a medical provider. The CAT Fund's liability, due to its stated purpose of providing to health care providers coverage in excess of their primary professional liability insurance, must be limited to injuries and damages arising directly from the provision or failure to provide medical services. To extend the CAT Fund's potential liability beyond claims directly arising from professional liability would unfairly burden the fund's resources and the health care providers who pay significant surcharges into the fund.

*Id.* (footnote omitted).

In the present case, the Fund applied the standard enunciated in *Physicians Ins. Co. v. Pistone,* 555 Pa. 616, 726 A.2d 339 (1999), for determining whether the acts alleged in Plaintiff Brown's civil action constituted *professional health care services.* "This standard[2] looks to whether the act that caused the alleged harm is a medical skill associated with specialized training." *Id.* at 626, 726 A.2d at 344 (footnote added).

Stenton Hall, however, asserted at oral argument that *Pistone* is inapplicable to case *sub judice* because it does not interpret the term *furnishing of medical services* contained in the Act but rather interprets the term *professional health care services* contained in an insurance policy issued by the insurance company in *Pistone.* We disagree.

Although the *Pistone* Court did not interpret the term *furnishing of medical services* contained in the Act, we find the Supreme Court's definition of the term *professional health care services* to be an equally correct interpretation of the term *furnishing of medical services* as contemplated by Section 103 of the Act's definition of *professional liability insurance.*

As discussed above, in order to meet the definition of a professional act or service under the *Pistone* test, the act that caused the alleged harm must be attributable to a medical skill associated with specialized

**2.** In *Pistone,* the Supreme Court adopted the definition of *professional acts or services* set forth by the Supreme Court of Massachusetts in *Roe v. Federal Ins. Co.,* 412 Mass. 43, 587 N.E.2d 214 (1992). In *Roe,* the Court stated:

> The standard recognizes several relevant considerations: (1) that membership in a profession has traditionally been recognized as requiring the possession of special learning acquired through considerable rigorous intellectual training; (2) that physicians and dentists, when regarding patient care, are called upon to use or apply special learning or attainments; (3) that, when there is a complaint of malpractice, attention should focus on the act or service performed rather than the fact that the alleged

wrongdoer was a physician or dentist because "the scope of professional services does not include all forms of a medical professional's conduct simply because he or she is a doctor or dentist," *Niedzielski v. St. Paul Fire & Marine Ins. Co.,* [134 N.H. 141, 144, 589 A.2d 130, 132 (1991)]; and (4) that, to fall within the insuring language like that used here, there must be a causal relationship between the alleged harm and the complained-of professional act or service, that is, it must be a medical or dental act or service that causes the harm, not an act or service that requires no professional skill.

412 Mass. at 48, 587 N.E.2d at 217.

training. Here, the evidence does not cite with any reasonable degree of medical or scientific certainty to any specific act as a cause of Decedent's salmonella.

In fact, Plaintiff Brown alleged in his complaint that Decedent's death *may* have been caused by unsanitary conditions related to the food services at Stenton Hall. In paragraph 32, Plaintiff Brown alleged that Stenton Hall's negligence included: "failing to utilize and/or to ensure the utilization of proper sanitary methods of food preparation" (¶ 32c); "failing to maintain and/or ensure the maintenance of a sanitary, clean and healthy facility" (¶ 32d); "failing to utilize and/or ensure the proper utilization of rodent and vermin control techniques" (¶ 32e); "failing to utilize and/or ensure the utilization of sanitary, clean and proper dishwashing techniques" (¶ 32f); and "failing to properly maintain, clean and sanitize cooking and food preparation equipment" (¶ 32g). Plaintiff Brown's Complaint at 8–9; R.R. 8a–9a.

Furthermore, there is no evidence that the *furnishing of medical services* as contemplated by the Act caused Decedent's salmonella.[3] Although Dr. Johnson noted in her report that proper cleaning procedures were not followed for reusable rectal thermometers, she stated only that trans-

mission of salmonella "*may have been related* to environmental contamination, use of shared patient items (e.g. thermometers),[4] and poor cleaning practices." DDC Report at 3; R.R. 28a (footnote added, emphasis added). "Statements that an assigned cause 'could have' been the cause of the condition have repeatedly been held to be legally insufficient." *Lewis v. Commonwealth*, 508 Pa. 360, 367, 498 A.2d 800, 803 (1985).[5]

Moreover, Dr. Johnson stated in her report that Decedent was the first of four persons to contract salmonella at Stenton Hall. DDC Report at 2; R.R. 27a. Decedent first developed symptoms on January 5, 1999 and died four days later on January 9, 1999. The onset dates for the other three cases were January 23, January 25, and January 31, 1999. *Id.* As such, it appears unlikely that Decedent contracted salmonella from a rectal thermometer contaminated with salmonella bacteria from another patient.

In addition, Plaintiff Brown's own expert, Dr. Bergman, stated in his report that "the exact method by which [Decedent] contracted his salmonella food poisoning may never be known with certainty. . . ." Bergman Report at 1; R.R. 47a. Although Dr. Bergman did opine that De-

---

**3.** The Department contends that Stenton Hall waived its argument that the evidence established that its furnishing of medical services, *i.e.,* nursing care services, caused Decedent's salmonella by taking the position in the civil action that there was no proof that Decedent contracted salmonella from Stenton Hall. The Department argues that Stenton Hall never notified the Fund prior to settlement about the weakness of its defense or that its experts had any doubts about its position. Therefore, the Department asserts that Stenton Hall cannot now claim for the first time before this Court that it was responsible for Decedent's death. However, inasmuch as the Fund reviewed the record and determined in its June 26, 2002 rejection of coverage that the information submitted demonstrated that the alle-

gations in the civil action did not involve professional liability, we believe that this issue is properly before the Court.

**4.** As noted by Grace Harrison, an expert witness for Stenton Hall, Dr. Johnson admitted that there was no "smoking gun" pinpointing Stenton Hall as the source of Decedent's salmonella. *See* Harrison Report at 5; S.R.R. 40b.

**5.** Although *Lewis* involved a workers' compensation proceeding, we believe that the same standard should apply in establishing causation of injury or death in a medical professional liability case.

cedent contracted salmonella from Stenton Hall as a result of its "substandard facilities," he did not specify as to whether the disease was contracted by means of food prepared at Stenton Hall, food brought in from outside sources or cross-contamination from one patient to another via caretaker hands or instruments.

In view of the foregoing, we believe that the Fund did not err in determining that under the *Pistone* standard, the record does not indicate that Decedent's salmonella resulted from the *furnishing of medical services* within the meaning of the Act. As a result, the Fund did not err in concluding that Stenton Hall's claim does not fall within the Act's definition of *professional liability insurance*.

## II.

■ Stenton Hall's second argument is that state and federal regulations governing the operation of long-term care nursing facilities establish that the nursing care and treatment provided to Decedent constituted the *furnishing of medical services* under the Act. Stenton Hall cites state regulations promulgated by the Department of Health under the Pennsylvania Health Care Facilities Act,[6] as well as similar federal regulations governing long-term care nursing facilities. In particular, Stenton Hall cites to regulations governing the duties and responsibilities of long-term care nursing facilities in the areas of dietary services (28 Pa.Code § 211.6; 42 C.F.R. § 483.35(h)) and nursing services, including supervision of the patients' treatment, medications, diet, and other health services (28 Pa.Code § 211.12(d)(5)). Stenton Hall also cites to regulations governing infection control (28 Pa.Code § 211.1(a); 42 C.F.R. § 483.65) and pest control (42 C.F.R. § 483.70(h)(4)).

In response, the Department initially contends that Stenton Hall's federal and state regulatory arguments are waived because they are being raised for the first time on appeal and were not raised in Stenton Hall's petition for review to this Court. Stenton Hall did state in paragraph 5 of its petition for review that Plaintiff Brown's complaint *alleged* that Decedent's death resulted from Stenton Hall's failure to "conform to the standards of reasonable and adequate nursing, convalescent and medical care and treatment of [Decedent]...." Stenton Hall's Petition for Review at 2. Nowhere in its petition did Stenton Hall state that it violated any state or federal regulations or that the Fund was obligated to provide coverage under the Act because Stenton Hall violated state or federal regulations regarding nursing care. Nevertheless, this Court will review Stenton Hall's regulatory argument on the basis that it might be considered to be "fairly comprised" within its statement regarding the nature of Plaintiff Brown's civil action and the Fund's obligation to defend against such a claim. *See* Pa. R.A.P. 1513(a) (petition's "statement of objections will be deemed to include every subsidiary question fairly comprised therein.")

The Department next contends in the event this Court decides that Stenton Hall did not waive its argument regarding the state and federal regulations, those regulations are nonetheless irrelevant to this matter. We agree.

As the Department points out, the Fund is an entity created and governed by the Act, not by the Health Care Facilities Act, which is administered by the Pennsylvania Department of Health. Further, the Fund does not promulgate, operate under, enforce or participate in any manner with the

---

6. Act of July 19, 1979, P.L. 130, *as amended,* 35 P.S. §§ 448.01–448.904b.

Department of Health's administration of the state and federal regulations cited by Stenton Hall.

Moreover, in accord with *Pistone*, the state and federal regulations cited by Stenton Hall do not govern acts constituting the *furnishing of medical services* under the Act. Although hygienic food handling, pest control programs, and general dietary supervision are required by these regulations, this does not establish that those duties and responsibilities constitute the *furnishing of medical services* within the meaning of the Act's definition of *professional liability insurance.*

Rather, these regulations govern the basic day-to-day operations of long-term care nursing facilities and do not require the type of medical skills associated with specialized training as contemplated by the Act's definition of *professional liability insurance.* To reiterate, the "CAT Fund's statutory mandate requires it to pay all awards, judgments and settlements for loss or damages against a health care provider as a consequence of any claim for *professional liability.*" *Connolly,* 559 Pa. at 5, 739 A.2d at 106 (emphasis added). "Section 701(d), however, should not be read so broadly as urged by appellant to include every injury or claim arising as a consequence of the provision of services by a medical provider." *Id.*

In view of the foregoing, we conclude that the Fund did not err in denying Stenton Hall's request for coverage under the Act on the ground that the alleged wrongdoing in Plaintiff Brown's civil action did not involve the furnishing of medical services as contemplated by the Act's defini-

tion of *professional liability insurance. Pistone; Connolly.*[7] Accordingly, we affirm.

Judge SMITH–RIBNER dissents and joins in the dissenting opinion of Judge FRIEDMAN.

Judge LEADBETTER dissents and joins in the dissenting opinion of Judge LEAVITT.

### *ORDER*

AND NOW, this 27th day of June 2003, Respondent Medical Professional Liability Catastrophe Loss Fund's June 26, 2002 Rejection of Coverage in the above-captioned matter is hereby AFFIRMED.

DISSENTING OPINION BY Judge FRIEDMAN.

The majority concludes that the Medical Professional Liability Catastrophe Loss Fund (Fund) properly denied Stenton Hall Nursing & Rehabilitation Center's (Stenton Hall) request for coverage under the Health Care Services Malpractice Act (Act)[1] on the ground that the "alleged wrongdoing in [Jeff C. Brown] Plaintiff Brown's civil action did not involve the furnishing of medical services as contemplated by the Act's definition of *professional liability insurance.*" (Majority op. at 12–13, emphasis in original.) Further, the majority approved the Fund's application of the standard set forth in *Physicians Ins. Co. v. Pistone,* 555 Pa. 616, 726 A.2d 339 (1999), to make that determination. Because I believe that Plaintiff Brown's civil action was based on the negligent furnishing of medical services and, thus,

---

**7.** Having determined that the Fund did not err in denying coverage, we need not address Stenton Hall's contention that the Fund is estopped from denying payment due and owing to Stenton Hall on the ground that it was not afforded the opportunity to participate in

the settlement of Plaintiff Brown's civil action.

**1.** Act of October 15, 1975, P.L. 390, *as amended,* 40 P.S. §§ 1301.101–1301.1006.

within the professional liability coverage provided by the Fund, and because I do not believe that *Pistone* dictates otherwise, I respectfully dissent.

Professional liability insurance is intended to insure against "liability on the part of a health care provider arising out of any tort or breach of contract causing injury or death resulting from the furnishing of medical services which were or should have been provided." 40 P.S. § 1301.103. I would consider it beyond dispute that, because there must be professional standards and practices by which health care facilities render care, damages flowing from a facility's negligent omission or commission in furnishing such care must be covered under the Act. In the civil action against Stenton Hall, Plaintiff Brown alleges, *inter alia*, that Chappell Brown's (Decedent) death from salmonella poisoning may have been caused by unsanitary conditions related to the food services at Stenton Hall; yet the Fund, supported by the majority, concludes that Plaintiff Brown's claim does not involve the *furnishing of medical services* as contemplated by the Act.[2] I find this incomprehensible because it ignores the fact that proper sanitation and diet are critical to health and, thus, essential parts of the medical services furnished by health care facilities to those too infirm to attend to those needs

themselves. Indeed, the provision of proper sanitation and adequate diet can, in some cases, be a life-sustaining medical treatment.[3]

Clearly, not all common day-to-day operations of health care facilities are covered by the Act. Because the Act provides recourse against health care providers only in instances of medical malpractice, the Act does not cover a claim merely because it arises out of events occurring in a health care facility. *See e.g., Gonzalez v. The Williamsport Hospital,* M79–0652, 14 Pa. D. & C.3d 577 (Opinion of the Administrator, dated March 25, 1980) (holding that a non-patient's slip and fall injury allegedly due to a hospital's negligence in failing to properly maintain a lavatory in a public area of the hospital was not covered under the Act). However, courts have had occasion to examine the scope of the Act's coverage as it relates to loss or damage resulting from the furnishing of medical services by health care facilities such as Stenton Hall. Where they found that the underlying events were integrally related to the medical care that a patient was in the facility to receive, the courts have held that a claim for injuries sustained as a result of a failure to provide such care lies within the Act's coverage as a matter relating to the furnishing of medical services by a health care provider.[4] I believe that

---

2. In addition to holding that Plaintiff Brown's allegation, i.e., that Decedent contracted salmonella due to unsanitary conditions at Stenton Hall, did not involve professional liability as defined by the Act, the majority also concludes that coverage under the Act is improper because the record lacks evidence to establish definitively that the unsanitary conditions and contaminated food at Stenton Hall actually were the cause of Decedent's salmonella poisoning. However, on July 25, 2002, Stenton Hall settled the civil action. Thus, the only question before us is whether the facts giving rise to this payment of damages constitute the furnishing of medical services under the Act.

3. Because a wholesome, appropriate dietary plan is such an important part of an individual's medical care, health care facilities such as Stenton Hall have a duty, not only to provide food, but also to ensure that the resident derives the proper nourishment from it by monitoring intake and taking care that the diet be appropriate to meet that person's medical needs.

4. For example, In *Herr v. St. Francis Hosp.,* 9 Pa. D. & C.3d 610 (1978), a patient injured himself when he attempted to climb out a window on the hospital's psychiatric ward. The common pleas court concluded that the type of confinement prescribed for a psychiat-

this is the standard that should have been applied here, and, under this standard, Plaintiff Brown's action against Stenton Hall would be covered by the Act.[5]

Instead, the Fund applied the test set forth in *Pistone*. In that case, a professional liability insurer sought declaratory judgment that its policy provided no coverage for a physician's acts of exposing himself to a patient, fondling her breasts and masturbating during a medical examination of the patient for gallstones. In holding that the physician's acts were not "professional health care services" and, therefore, were outside the policy's coverage, our supreme court focused on whether the alleged harm was attributable to a medical skill associated with specialized training. In doing so, the court recognized that the action was, in reality, a tort for sexual molestation; there simply was no connection between the doctor's sexual improprieties and his examination of the patient for gallstones. I certainly would agree that when a patient is receiving legitimate medical treatment, during which her physician sexually assaults her, the doctor's improper acts are not part of his medical treatment. Consequently, an action for damages relating only to those improper acts[6] cannot be considered as

arising from the rendering of professional health care services. However, that is not this case.

The Act defines a health care provider as "a primary health center or a person, corporation, university or other educational institution, facility, institution or other entity licensed or approved by the Commonwealth to provide *health care or professional medical services* as a physician, a certified nurse midwife, a podiatrist, hospital, nursing home, birth center, and ... an officer, employee or agent of any of them acting in the course and scope of employment." 40 P.S. § 1301.103 (emphases added). Thus, the Act encompasses *both* general *health care*, which pertains to the overall care and supervision that should be furnished to patients as part of their medical treatment, and *professional medical services*, which pertains to treatment calling upon specialized medical skill "acquired through considerable rigorous intellectual training."[7] In *Pistone*, our supreme court applied a standard that recognized the distinction; thus, in determining whether the doctor's actions during medical treatment were under the Act's coverage, the court properly considered those actions in the context of furnishing *professional medical services*.

---

ric patient is part of the furnished medical services so that the hospital's failure to confine him in a secure area was a claim covered by the Act. The court determined that questions were raised concerning the hospital's supervision of a patient, which was a subject intimately related to the medical or psychiatric treatment being received.

In *Geisinger Medical Center v. Fisher*, 50 Pa.Cmwlth. 578, 413 A.2d 462 (1980), a patient died when he plunged through one of the center's windows. Relying on *Herr*, this court recognized that that alleged negligence of the medical center in failing to properly supervise and restrain a patient with suicidal tendencies is related intimately to the furnishing of medical services and, thus, a proper matter for coverage under the Act.

5. In short, a health care facility's obligation to furnish its residents with a sanitary environment and adequate and proper nutrition is an integral part of the medical care it renders, and unsanitary conditions and substandard or unwholesome food constitute a failure to furnish the medical services that the resident is at the facility to receive. Therefore, where it is alleged that Decedent died as a result of just such conditions at Stenton Hall, the claim is covered under the Act.

6. That is, where there is no allegation that the patient was harmed during the examination by the physician's negligent performance of, or failure to perform, *medical* services.

7. *See Pistone*, quoting *Roe v. Federal Ins. Co.*, 412 Mass. 43, 48, 587 N.E.2d 214, 217 (1992).

Stenton Hall, however, is a health care facility responsible for furnishing its residents with needed, appropriate *health care*, of which proper sanitation and nutrition are crucial components. Because Plaintiff Brown's claims against Stenton Hall allege its negligent failure to furnish such health care, I believe the action falls within the Act's coverage.[8]

## DISSENTING OPINION BY Judge LEAVITT.

With due respect to the majority, I dissent.

The rejection of coverage issued by the Medical Professional Liability Catastrophe Loss Fund is not a final order[1] within the meaning of The Administrative Agency Law, 2 Pa.C.S. §§ 501–508, 701–704. Therefore, it is prematurely presented to our appellate jurisdiction. I would transfer Stenton Hall's petition for review to the Insurance Department with instructions to conduct an adjudicatory hearing on the issues raised therein. This was the course followed in *Philadelphia County Medical Society v. Kaiser*, 699 A.2d 800 (Pa.Cmwlth.1997), and it is the appropriate response here, where, again, we are presented with a determination that is preliminary, not final, because of the absence of a formal administrative hearing.

8. Nor does *Connolly v. Med. Prof'l Liab. Catastrophe Loss Fund*, 559 Pa. 1, 739 A.2d 104 (1999), compel a different result. In that case, the appellant did not provide or fail to provide medical services herself; instead, the claim made against her arose from an alleged duty on her part, as officer of her physician husband's professional corporation, to inform patients of her spouse's inability to provide medical care due to his deteriorating mental condition and to advise patients to seek medical attention from a different physician. Because such damages did not rise *directly* from the *appellant's* provision or failure to provide medical services, the court determined that the Fund was not obligated to defend appellant in the action against her. Clearly, the rationale in *Connolly* is completely inapplicable here.

1. An adjudication must be preceded by a formal administrative hearing that results in a final order that this Court can review in its appellate jurisdiction.