**Herb v. Spock**

C.P. of Montour County, no. 82 of 2000.

*Paul F. D'Emilio* and *Stephanie E. Chertok,* for plaintiff.
*Donna Rae,* for defendant Geisinger.
*Kevin Osborne,* for defendant Danella.

JAMES, *J.,* May 27, 2005—This matter is before the court to consider defendant John F. Danella M.D.'s summary judgment motion seeking to dismiss plaintiff's claims against him. Plaintiff filed this action on behalf of his wife, Rochelle R. Herb (decedent), contending that defendant Danella was negligent in treating and managing her renal cell carcinoma from which she eventually died. Discovery has been completed, and the case is scheduled to be tried to a jury at the end of June 2005.

Defendant contends that there are no genuine issues of material fact. Specifically, defendant Danella contends that plaintiff's experts fail to establish a prima facie case for negligence and that the matter must be dismissed.

## FACTUAL HISTORY

Decedent underwent a right radical nephrectomy and cavotomy on April 3, 1997, to remove a tumor on her kidney. She was followed up by defendant Danella, a board-certified urologist. He is not board certified in urologic oncology, but since 1992 has devoted over two-thirds of his practice to urologic oncology. He completed a fellowship at UCLA in urologic oncology.

In March 1998, decedent was found to have cancer involving her pelvic bone and liver. Geisinger oncologist Dr. Nair prescribed immunotherapy, but she ultimately died of metastatic cancer.

Plaintiff's claim of liability relies on the expert reports of two physicians. First, Dr. Thomas E. Kasper, a urologist, opines that "Dr. John Danella failed to meet the accepted standards of good urologic practice in not refer-

ring Ms. Herb for oncologic consultation after performing a right nephrectomy on Ms. Herb on April 3, 1997, for renal cell carcinoma." He further states that "[b]y not referring Ms. Herb for oncologic consultation, she was not afforded the opportunity for adjuvant therapy (immunotherapy and/or chemotherapy) which would have reduced the potential for development of metastatic spread of her renal cancer."

Dr. Lillian F. Pliner, a medical oncologist, opined:

"There is no established role for adjuvant treatment after nephrectomy in patients who have undergone a complete resection of tumor. Thus, *the standard of care following nephrectomy remains observation and enrollment of eligible patients in randomized clinical trials if available.* (emphasis added)

"Follow-up of cancer patients is best undertaken by medical oncologists, who are best qualified to inform cancer patients about their prognosis and treatment options. If such a referral is not made, however, at a minimum, the treating physician is obligated to inform himself or herself, and then the patient, of the appropriate follow-up care and treatment options so that the patient suffers no detriment from the failure to refer her for evaluation by a medical oncologist. In the present case, Mrs. Herb was neither referred to a medical oncologist early in her post-surgical period, nor advised by her physicians of the recommended follow-up care and treatment options as a medical oncologist would have done. As a result, she was not timely informed of the potential for her enrollment in clinical trials, which might have been of benefit to her."

In a later report dated March 25, 2005, Dr. Pliner said:

"[T]he treating physician's failure even to seek such a trial for Ms. Herb necessarily prevented her from being enrolled in one. *This was a violation of the applicable standard of care at that time, which was observation and enrollment of eligible patients in clinical trials if available.* (emphasis added)

"To date, adjuvant treatment trials in kidney cancer have not shown improvements in survival or relapse-free survival. However, the close medical supervision provided to patients in such trials permits the early identification of the development of metastatic disease. Once identified in Ms. Herb, certain such metastases could have been subject to resection. Complete resection of such metastases has been shown to be associated with improved survival."

However, defendant Danella properly states that the record shows that there is no evidence of any clinical trials that were available for decedent in 1997. Dr. Pliner stated:

"[I]t has not been possible for me to identify to date the clinical trials that were open to new patient accrual for the adjuvant treatment of Stage III renal cell cancer in 1997. This is because the principal purpose of the available databases is to assist physicians presently caring for patients in identifying clinical trials that are presently open to new patient accrual, not actually creating an historical record of past trials. Such databases also existed in 1997, however, and it would not have been difficult for the treating physicians to have consulted them if they had chosen to do so. . . . I have not been able to locate to

date an historical database identifying clinical trials that were open to accrual in 1997 . . . ."

Discovery has revealed no clinical trials for which decedent would have qualified. Importantly, neither of plaintiff's experts has specifically addressed the facts of this case. Dr. Pliner simply said that enrolling a person in a clinical trial may indirectly improve survival because of closer medical supervision. This decedent's facts and situation are never addressed.

Moreover, the only evidence of clinical trials and the availability for the decedent shows there were none available. The following is the exchange between plaintiff's counsel and defendant Danella in his deposition dated December 29, 2003, pp. 55-56:

"Q. Would there have been clinical trials available to her in March 1998? Excuse me. I'll rephrase that.

"A. You mean after she was proven to have recurrence?

"Q. No. I gave you the wrong date. Were there clinical trials available to her after April 3, 1997?

"A. Not to my knowledge.

"Q. In April of 1997, did you make an independent investigation as to whether any clinical trials existed?

"A. I don't recall. As a matter of fact, I don't think there are any today.

"Q. Was Geisinger doing clinical trials in March 1997?

"A. In all cancers?

"Q. Yeah.

"A. Yeah.

"Q. Including renal cell?

"A. I believe they had a trial for patients with metastatic disease. I don't know if this patient was enrolled in that. Did they have one for patients with Stage 3 resected cancer? No."

The record shows that decedent was a patient with Stage 3 resected cancer.

The issue is whether a prima facie case for medical negligence is established when plaintiff's expert opines that the treating physician's standard of care is breached by his failure to seek to place decedent in a clinical trial, when there is no proof that such trial was available for decedent and where there is no expert evidence that failure to seek to place decedent in such a clinical trial caused her death and damages.

## Discussion

The standard for determining whether summary judgment should be granted is set forth in Pa.R.C.P. 1035.2:

"After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

"(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

"(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to

the cause of action or defense which in a jury trial would require the issues to be submitted to a jury."

"The essence of the revision set forth in new Rule 1035.2 is that the motion for summary judgment encompasses two concepts: (1) the absence of a dispute as to any material fact and (2) the absence of evidence sufficient to permit a jury to find a fact essential to the cause of action or defense. The former rule was unclear as to whether it encompassed the type of motion which is based upon a record which is insufficient to sustain a prima facie case. New Rule 1035.2(2) is explicit in authorizing such a motion." Pa.R.C.P. 1035.2, Explanatory comment—1996.

In determining the merit of a motion for summary judgment, the court must examine the record in the light most favorable to the non-moving party. *Ward v. Rice,* 828 A.2d 1118, 1120 (Pa. Super. 2003). All doubts as to the existence of a genuine issue of material fact must be resolved in favor of the non-moving party on motion for summary judgment. *Id.*

### Relevant Medical Negligence Law

The requisite proof required for a medical malpractice action is well settled. "In order to establish a prima facie case of malpractice, plaintiff must establish (1) a duty owed by the physician to the patient, (2) a breach of duty from the physician to the patient, (3) that the breach of duty was the proximate cause, or substantial factor in bringing about the harm suffered by the patient, and (4) damages suffered by the patient that were a direct result of the harm." *Mitzelfelt v. Kamrin,* 526 Pa. 54, 62, 584 A.2d 888, 891 (1990).

In proving a medical malpractice case, a plaintiff is required to present an expert witness who will testify, to a reasonable degree of medical certainty, that the acts of the physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered. *Flanagan v. Labe,* 446 Pa. Super. 107, 111, 666 A.2d 333, 335 (1995), *aff'd,* 547 Pa. 254, 690 A.2d 183 (1997).

The Pennsylvania Supreme Court outlined the following approach for determining whether the plaintiff established causation in a medical malpractice case:

Once a plaintiff has demonstrated "that defendant's act[s] or omissions increased the risk of harm to a person in plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm." *Hamil v. Bashline,* 481 Pa. 256, 269, 392 A.2d 1280, 1286 (1978).

"Where the events and circumstances of a malpractice action are beyond the knowledge of the average layperson, the plaintiff must present expert testimony that the acts of the medical practitioner deviated from good and acceptable medical standards, and that such deviation was a substantial factor in causing the harm suffered." *Montgomery v. South Philadelphia Medical Group Inc.,* 441 Pa. Super. 146, 155, 656 A.2d 1385, 1390 (1995).

"[M]edical opinion need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct *increased the risk* of the harm actually sustained, and the jury then must decide whether that conduct was

a substantial factor in bringing about the harm." *Jones v. Montefiore Hospital,* 494 Pa. 410, 417, 431 A.2d 920, 924 (1981). (emphasis in original)

In this case, plaintiff asserts that his expert has stated that the omission of defendant Danella in failing to seek clinical trials to treat decedent's Stage 3 kidney cancer increased the risk of harm to her. Plaintiff argues that this is a jury question. This argument fails on the undisputed facts and law for several reasons. First, there is no evidence whatsoever that clinical trials existed which were available to decedent. Defendant Danella specifically denied that there was a clinical trial available "for patients with Stage 3 cancer." (Danella depo. p. 56.) Plaintiff's expert knew of no applicable and available clinical trials. Discovery revealed no clinical trials. Without the existence of clinical trials, plaintiff's premise for liability fails. Plaintiff has the burden of proof, and there is a hole in that proof that simply invites guess and conjecture. The fact-finder, however, "cannot be permitted to reach a decision on the basis of speculation or conjecture." *Biddle v. Johnsonbaugh,* 444 Pa. Super. 450, 455, 664 A.2d 159, 161 (1995). Without proof that clinical trials actually existed, assigning liability to defendant Danella requires a major leap of faith.

Moreover, plaintiff's expert, Dr. Pliner, further speculates that if decedent had been enrolled in clinical trials, she would have been observed more closely, and if metastases were identified, they "could have" been subject to resection, thus improving survival. Once again, such testimony and opinion invites conjecture. "Statements that an assigned cause 'could have' been the cause of the condition have repeatedly been held to be legally insuf-

ficient." *Stenton Hall Nursing & Rehabilitation Center v. Medical Professional Liability Catastrophe Loss Fund,* 829 A.2d 377, 382 (Pa. Commw. 2003). There is no evidence that decedent had the kind or type of metastases that could have, or would have, been identified by closer observation in clinical trials (if there were any available, of which there is no proof). In fact, there is no evidence that the metastases that were ultimately found were subject to complete resection.

Finally, the speculative nature of the opinion evidence, in light of the factual context, is supported by the expert's analysis of the effectiveness of clinical trials in cases of this type. Dr. Pliner says that "[t]o date, adjuvant treatment trials in kidney cancer have not shown improvements in survival or relapse-free survival." Such testimony can only confuse a jury and invite a verdict based on guess, speculation, and conjecture.

In summary, based on the undisputed genuine material facts, plaintiff cannot present a prima facie case for the jury to consider. Plaintiff's expert testimony at best creates an incomplete circuit of proof. Without proof of the existence of clinical trials that were available to the decedent, plaintiff cannot prove breach of duty, causation, or damages.[1]

---

1. The action against the corporate defendants, Geisinger Medical Center and Geisinger Clinic, must also be dismissed since the actions against them are based on defendant Danella's alleged liability and vicarious liability.

## ORDER

And now, May 27, 2005, after consideration of defendant John F. Danella M.D.'s summary judgment motion, summary judgment is granted in favor of defendants John F. Danella M.D., Geisinger Medical Center and Geisinger Clinic, and against plaintiff.