894 A.2d 733

Walter M. STRINE, Walter M. Strine, Jr. and William
B. Strine, Trading as Commonwealth Real Estate
Investors d/b/a Chester Care Center, Appellees

v.

COMMONWEALTH of Pennsylvania, Medical Care Availability
and Reduction of Error Fund, and John H. Reed, Former Di-
rector of Medical Professional Liability Catastrophe Loss
Fund, Appellants.

Supreme Court of Pennsylvania.

Argued Nov. 30, 2004.

Decided March 29, 2006.

Guy Anthony Donatelli, West Chester, Zella Smith Anderson, Kenneth J. Serafin, Harrisburh, Leslie Ann Miller, for Medical Care Availability and Reduction of Error Fund, appellant.

James Edmond DelBello, Jr., for Walter M. Strine, et al., appellees,

BEFORE: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice SAYLOR.

The issue in this direct appeal is whether the provision of a bath to a nursing home patient as therapy to relieve bed sores constitutes the furnishing of medical services sufficient to trigger the statutory obligations of the former Medical Professional Liability Catastrophe Loss Fund.

### I.

Marie Barnes was a 75 year-old patient-resident of the Chester Care Center ("Chester Care"), a licensed health-care provider. Mrs. Barnes suffered from dementia, diabetes, and coronary artery disease, and was unable to walk, speak, or feed herself. Because she was bedridden, she also suffered

from decubiti (bedsores). Although her physician prescribed a daily whirlpool bath as a treatment for her bedsores, Chester Care did not have a whirlpool bath; as a result, Mrs. Barnes was given a regular bath on a daily basis. This represented a departure from Chester Care's ordinary policy of bathing residents twice weekly. In January 1996, Tommy Twyman, a certified nursing assistant employed by Chester Care, drew a bath for Mrs. Barnes, but apparently did not check the water temperature before placing her in it. The bath water was 138 degrees and caused Mrs. Barnes severe burns from which she died three days later.[1]

A wrongful death action was brought against Appellees, and the parties settled before trial for $1.5 million, of which the Pennsylvania Property and Casualty Insurance Guaranty Association ("PPCIGA") paid $200,000 on behalf of Chester Care's basic coverage insurer, P.I.E. Mutual Insurance Company of Ohio, then in liquidation. *See generally Bell v. Slezak*, 571 Pa. 333, 341, 812 A.2d 566, 570 (2002) (providing an overview of PPCIGA's purpose and operation). After Chester Care paid the $1.3 million balance, it sought partial indemnification from the Medical Professional Liability Catastrophe Loss Fund (the "CAT Fund") pursuant to its statutory excess coverage in the amount of $1 million.[2] The CAT Fund refused to indemnify Chester Care, however, stating that it was not liable because the bath given Mrs. Barnes did not constitute a medical service supporting a claim for professional liability

---

1. There is conflicting evidence as to whether Mr. Twyman checked the water temperature, and whether the high temperature resulted from a defective valve. It is undisputed, however, that Mrs. Barnes was exposed to excessively hot water during her bath, and that such exposure caused her death.

2. The CAT Fund was the subject of the allegations brought in the proceeding below. It was abolished by the Act of Mar. 20, 2002, P.L. 154, No. 13 (effective Jan. 1, 2004) (the "MCARE Act"), and replaced with the Medical Care Availability and Reduction of Error Fund (the "MCARE Fund"). The latter is a party to the present litigation as the successor in interest to the former. *See Pennsylvania Med. Soc'y Liab. Ins. Co. v. CAT Fund*, 577 Pa. 87, 90-91, 842 A.2d 379, 380 (2004). To avoid confusion with the terms used in the relevant precedents, Appellants will be referred to as either the "CAT Fund," or simply, the "Fund."

under the Health Care Services Malpractice Act.[3] The CAT Fund maintained that the bath was merely part of Mrs. Barnes' "routine care," and thus, would not have been covered by medical malpractice liability insurance, which in turn relieved the CAT Fund of any statutory duty to furnish indemnification.

On April 28, 1999, Chester Care instituted this action against the CAT Fund in the Commonwealth Court within that court's original jurisdiction, alleging, *inter alia*, that the CAT Fund had not only breached its statutory duty in refusing to indemnify Chester Care, but had also acted in bad faith in refusing to respond to settlement demands and otherwise behaving obstinately throughout the underlying wrongful death litigation. Thus, Chester Care demanded $1.3 million in damages, as well as reimbursement for attorney's fees it had incurred in both the wrongful death matter and the instant CAT Fund action. The CAT Fund filed preliminary objections in the nature of a demurrer, in which it asked the court to: dismiss the bad faith claim; limit the CAT Fund's potential liability on the breach of statutory duty claim to $1 million; dismiss Chester Care's requests for reimbursement for defense costs such as attorney's fees; and strike three allegedly impertinent paragraphs from Chester Care's complaint. The Commonwealth Court sustained each of these preliminary objections.

Chester Care then filed a motion for partial summary judgment with respect to its sole remaining claim of breach of statutory duty, alleging that there were no issues of material fact between the parties, and that it was entitled to judgment as a matter of law on the ground that the CAT Fund was

3. Act of October 15, 1975, P.L. 390 (as amended, 40 P.S. §§ 1301.101– 1301.1006) (the "Malpractice Act"). The Malpractice Act was repealed in part and amended in part by the MCARE Act. *See supra* note 2. These changes are not relevant to the present case. As the facts here arose prior to this repeal, the Malpractice Act remains the relevant law for present purposes. It should be noted, moreover, that parts of the Malpractice Act were amended by the Act of Nov. 26, 1996, P.L. 776, No. 135. However, as this dispute arose prior to that amendment, all references to the Malpractice Act refer to the statute as it existed prior to its amendment in November 1996.

legally obligated to insure its claim pursuant to the Malpractice Act. In pertinent part, the Malpractice Act directs the CAT Fund to indemnify certain health care providers against claims for "professional liability," 40 P.S. §§ 1301.102, 1301.701(d), with professional liability insurance defined under the Malpractice Act as

> insurance against liability on the part of a health care provider arising out of any tort or breach of contract causing injury or death *resulting from the furnishing of medical services which were or should have been provided.*

40 P.S. § 1301.103 (emphasis added) (superseded).

In response, the CAT Fund repeated its contention that it had no duty to indemnify Chester Care because a bath is not a "furnishing of medical services." On December 16, 2002, the Commonwealth Court concluded that providing the bath in this case did constitute furnishing medical services and, accordingly, it granted Chester Care's motion. In doing so, the court emphasized that the bath was prescribed as a treatment for Mrs. Barnes' bedsores, that it was provided by a certified nurse's assistant, and that it was given as part of a treatment regime that differed from the ordinary course in which patients only received semi-weekly baths. On August 1, 2003, after Chester Care moved for summary judgment as to damages, the court entered a final order awarding Chester Care $1 million. In its accompanying opinion, the court explained that

> the bathing of Mrs. Barnes that resulted in her death was not routine care under [Chester Care]'s twice-weekly bath policy. The bath given to Mrs. Barnes was pursuant to a prescription by her physician for daily baths as "treatment" of her bedsores and therefore the bath was "the furnishing of a medical service." We [are] not dissuaded from this conclusion by the fact that because the Center did not have a whirlpool as prescribed, the regular bathing facilities of the center were utilized; or by the fact that the prescription did not direct that medication be placed in the bath. Obviously, the physician was satisfied that the bath water was an

appropriate therapeutic agent for healing the bedsores and alleviating the patient's symptoms.

*Strine v. Commonwealth,* 270 M.D. 1999, *slip op.* at 3 (Pa. Cmwlth.2003) (Morgan, S.J.).

. The CAT Fund appealed from the grant of summary judgment, and Appellees cross-appealed from the order sustaining the CAT Fund's preliminary objections. After summarily affirming the latter order, *see Strine v. Commonwealth,* 580 Pa. 2, 858 A.2d 1156 (2004) (*per curiam*), this Court heard argument on the CAT Fund's appeal, the resolution of which involves two questions: first, what is the scope of the CAT Fund's statutorily-imposed responsibility under Section 103 of the Malpractice Act (quoted above), and second, do the activities which led to Mrs. Barnes' death fall within that scope?

 A motion for summary judgment may be granted only when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *See* Pa.R.C.P. 1035.2; *Valles v. Albert Einstein Med. Ctr.,* 569 Pa. 542, 549 n. 7, 805 A.2d 1232, 1236 n. 7 (2002). A reviewing court may disturb the trial court's grant of summary judgment if it determines that the court committed an error of law or abused its discretion. *Id.* Furthermore, a factual issue is considered "material" for summary judgment purposes if its resolution could affect the outcome of the case under the governing law. *See generally Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). As the substantive law defines which facts are material, *see id.,* we will initially resolve the first question stated above, which is a purely legal issue as to which our review is *de novo. See Swords v. Harleysville Ins. Cos.,* 584 Pa. 382, 390, 883 A.2d 562, 566 (2005).

## II.

 As part of the Malpractice Act, the General Assembly created the CAT Fund to serve as a

contingency fund for the purpose of paying all awards, judgments and settlements for loss or damages against a

health care provider entitled to participate in the fund as a consequence of any claim for professional liability brought against such health care provider as a defendant or an additional defendant to the extent such health care provider's share exceeds its basic coverage insurance in effect at the time of occurrence....

40 P.S. § 1301.701(d) (superseded).[4] Pursuant to the above, the CAT Fund's liability is limited to losses occasioned by claims for "professional liability." Although the statute does not expressly define this term, it does define "professional liability insurance," as previously noted, by reference to "medical services which were or should have been provided." 40 P.S. § 1301.103 (superseded). Thus, it is evident that "professional liability" under the act implies liability "resulting from the furnishing of medical services which were or should have been provided." 40 P.S. § 1301.103 (superseded); *accord Connolly v. CAT Fund,* 559 Pa. 1, 5, 739 A.2d 104, 106 (1999) ("From this definition [of "professional liability insurance"], we can reasonably infer that professional liability therefore arises from the provision of medical services or failure to provide appropriate medical services."). We must determine, then, what types of activities qualify as "medical services" for purposes of the act.

This Court faced a similar question in *Connolly,* in which a doctor with Alzheimer's disease continued to treat patients in spite of his deteriorating mental state. Apparently due to this condition, he failed to advise one of his patients to seek follow-up care for cancer, thereby leading to the patient's death. The executor of the patient's estate commenced an action

---

**4.** The parties do not dispute that Chester Care qualifies a health care provider within the meaning of the Malpractice Act. The statute defines a "health care provider" as

a primary health center or a person, corporation, facility, institution, or other entity licensed or approved by the Commonwealth to provide health care or professional medical services as a physician, a certified nurse midwife, a podiatrist, hospital, nursing home, birth center, and except as to 701(a) [pertaining to the CAT Fund], an officer, employee or agent of any of them acting in the course and scope of employment.

40 P.S. § 1301.103 (superseded).

against, *inter alia,* the doctor's wife, who was an employee and corporate officer of her husband's medical practice, based upon breach of an alleged duty to warn patients of her husband's limitations and advise them to seek attention from a different physician. This raised the issue of whether the CAT Fund was required to defend the wife. The court determined that not every injury or claim that arises as a consequence of providing medical services falls under the heading of "professional liability" for purposes of the act. Rather, the CAT Fund only need cover those claims that arise directly from the provision of medical services, and the underlying claim against the wife did not fit this description. *See id.* at 5–6, 739 A.2d at 106. While *Connolly* undertook to determine the meaning of "medical services," it is of limited value here, as the central question in that matter pertained to the Fund's responsibilities concerning claims that are essentially derivative in nature, i.e., causes of action that only *indirectly* proceed from the faulty provision of medical services. Critically for present purposes, *Connolly* did not purport to draw the boundaries of what constitutes the furnishing (or failing to furnish) of medical services in the first instance, that is, in circumstances where the cause of action is premised directly upon the alleged faulty provision of health care.

Of greater assistance in this regard is the case of *Physicians Ins. Co. v. Pistone,* 555 Pa. 616, 726 A.2d 339 (1999), in which a private medical malpractice insurer sought a declaration that it was not required to indemnify a physician who had sexually assaulted a patient during a medical examination. Under the insurance policy, the insurer was required to cover injuries arising out of "professional health care services." This Court determined that such services, for purposes of the contract, were actions or services in which special learning is applied, that is, activities involving "a medical skill associated with specialized training," *id.* at 626, 726 A.2d at 341, which plainly excluded the doctor's assault on his patient.[5]

5. In adopting this construction of the contractual term, the *Pistone* court followed the general definition of professional liability set forth in *Marx v. Hartford Accident & Indem. Co.,* 183 Neb. 12, 157 N.W.2d 870

Presently, the CAT Fund urges us to apply similar reasoning in construing its statutory duties relative to "professional liability" stemming from "medical services" as those terms appear in the Malpractice Act. In short, the Fund requests that, in determining whether the bath constituted a "medical service," we inquire solely whether it entailed a medical skill associated with specialized training. Appellees respond by highlighting distinctions between the present case and *Pistone*, chiefly that *Pistone* involved a private insurance contract rather than a claim for statutory indemnification under the Malpractice Act, and that the specific phrase construed in *Pistone* ("professional health care services") differs from the statutory text at issue here ("professional liability").

We find some merit in each of the parties' arguments. The CAT Fund is essentially correct in suggesting that *Pistone's* elucidation of the nature of professional health care services bears relevance to the scope of the CAT Fund's statutory duties as well. Simply put, if the phrase "professional health care services" signifies a medical skill associated with specialized training for purposes of a private malpractice insurance policy, then it is not apparent why "medical services" which can lead to "professional liability," as those terms appear in the Malpractice Act, should have a fundamentally different connotation. It also cannot be overlooked that the CAT Fund is intended to operate as an excess insurer as regards the portion of a malpractice claim exceeding the health care provider's basic coverage for professional liability, *see, e.g.*, 40 P.S. §§ 1301.701(b)(2); 1301.701(d) (stating that the CAT Fund's purpose is to pay all claims "against a health care provider ... to the extent such health care provider's share

(1968), as applied to the health care profession by *Roe v. Federal Ins. Co.*, 412 Mass. 43, 587 N.E.2d 214 (1992). *See Pistone*, 555 Pa. at 620–21, 726 A.2d at 341–42. In the process, *Pistone* rejected alternative proposed definitions from other jurisdictions turning upon whether there was a "substantial nexus" between the injurious actions and the professional setting, or whether the harmful conduct was "intertwined with and inseparable from" the medical services provided. The *Pistone* court noted that these latter standards tended to remove the focus from the individual acts performed by the health care professional. *See id.* at 626, 726 A.2d at 341.

exceeds its basic coverage"); *Connolly*, 559 Pa. at 5–6, 739
A.2d at 106 (emphasizing that the statutory purpose of the
CAT Fund is to supply "coverage in excess of [health care
providers'] professional liability insurance"); *see also* 40 P.S.
§ 1301.701(a) (requiring that Pennsylvania health care provid-
ers obtain insurance at a basic level against professional
liability, through either a licensed insurance carrier or an
approved self-insurance plan), and utilizing different defini-
tions of professional health care services depending upon
whether the term appears in a private insurance contract or in
the statute would be at odds with this facet of the Fund's
underlying purpose.

■ On the other hand, Appellees are correct in highlight-
ing that *Pistone* dealt with a private contract, whereas here
the words of a legislative enactment are in issue. Clearly,
Section 103's use of the term "medical services" cannot be
restricted by the specific insurance policy at issue in that or
any other litigation, but must instead be understood by refer-
ence to the Malpractice Act's own broadly defined class of
health care providers. *See supra* note 4. For purposes of the
act, then, "medical services" signifies the professional health
care services of a covered health care provider. Accordingly,
in determining whether the bath given to Mrs. Barnes trig-
gered coverage by the Fund, we must focus on whether this
service involved a medical skill (broadly understood as per the
above) associated with specialized training.

## III.

In applying this standard to the present case, the parties
are in sharp disagreement over whether Mrs. Barnes' bath
was a medical service within the reach of the act. The CAT
Fund argues that the bath did not require any particular skill
associated with specialized training, and claims that requiring
the Fund to cover this procedure would convert it into a
general premises liability carrier responsible even for ordinary
slip-and-fall claims and other similar causes of action. In

support of this position, the Fund highlights the following testimony of Mr. Twyman:

Q. ... Did you bathe [Mrs. Barnes] ... because of the bedsore problems?

A. She was supposed to have a whirlpool every day, but we didn't have a whirlpool so I gave her a bath every day.

Q. And were you the person during the day that was responsible for taking care of her?

A. During my shift. Sometimes I was, sometimes I wasn't. But since I was the only orderly on 2A, they needed me to pick her up, put her in the bath, pick her up, take her out of the bath.

RR. 551a. The CAT Fund maintains that a "strong back" rather than specialized training, was all that was required for the bath. Brief for Appellants at 29. It also avers that Mrs. Barnes' injuries could not have resulted from professional malpractice because her doctor's prescription relating to the alleviation of bedsores specified that she needed a whirlpool bath and, moreover, had expired at the time the bath was given; the Fund argues that the ordinary bath given outside of the prescription's timeframe therefore only served purposes relating to routine hygienic care rather than any medical objective. The Fund finally contends that, in any event, the real cause of the harm had nothing to do with Mr. Twyman's actions, but resulted instead from a faulty hot-water valve, thereby removing the entire matter from the professional malpractice arena.

Appellees, for their part, point out that: Mrs. Barnes was in a state of complete dependency upon the nursing home for all of her care, being tube-fed and unable to walk, speak, or bathe herself; her bedsores were a recognized medical condition that could produce sepsis or other complications if not properly treated; her attending physician ordered whirlpool baths, which constitute a treatment for this condition; and her bath, although not a whirlpool one, was given pursuant to these orders by a trained nurse's aide. Appellees also highlight the deposition testimony of Kevin Corrigan, the Fund's claims

examiner, stating his view that any procedure (including a bath) performed in caring for an individual suffering from Mrs. Barnes' condition cannot properly be considered routine in view of her total dependency, and that special skill would be required to give her even a regular bath, *see* RR. 149a, as well as his testimony that the injuries were due, at least in part, to professional malpractice because Mr. Twyman either failed to check the water temperature before placing Mrs. Barnes in the tub, or left her unattended while she was in the water, *see* RR. 620b.

Appellees emphasize as well that a nurse's aide is required by law to complete certain training, *see generally* 55 Pa.Code § 1181.521, and that Mr. Twyman specifically testified he underwent six weeks of formal classroom education at Chester Care, including instruction on bathing and patient care. *See* RR. 1552–53b. Finally, Appellees highlight various regulations promulgated by the Department of Public Welfare ("DPW") which pertain to long-term care nursing facilities which provide skilled or intermediate nursing care, and to nursing-home financial aid under Pennsylvania's Medical Assistance Program. *See generally Harston Hall Nursing & Convalescent Home, Inc. v. DPW*, 99 Pa.Cmwlth. 475, 478–79, 513 A.2d 1097, 1098–99 (1986). Under these regulations, the term "skilled or intermediate nursing care" includes daily inpatient services provided pursuant to a physician's directions, *see* 28 Pa.Code § 201.3, which in turn subsumes treatment for bedsores. *See* 55 Pa.Code Ch. 1181, Appendix E, § II(b)(i)(F). Thus, Appellees argue:

> Mrs. Barnes required skilled nursing and rehabilitative care and services as a result of her decubitus ulcers [bedsores] and her overall physical and mental condition. She was unable to bathe herself and was receiving total care from the nursing home. The bath given to Marie Barnes on January 3, 1996, was part of the skilled nursing care provided to treat her decubitus ulcers and to maintain universal precautions against infection and ensure her medical safe-

ty. . . . This skilled care meets the definition of a medical service discussed in *Pistone* . . . .

Brief for Appellees at 27.

As an initial matter, we disagree with the CAT Fund's suggestion that coverage is precluded on the basis that an equipment failure is to blame for the occurrence. Even accepting, *arguendo,* that the water's excessive heat was occasioned by a faulty valve, it is evident that Mr. Twyman's inattentiveness in administering the bath was also a substantial contributing factor in causing Mrs. Barnes' death. *See Harsh v. Petroll,* 584 Pa. 606, 614 n. 9, 887 A.2d 209, 213 n. 9 (2005) (noting that substantial factor causation supports tort liability in Pennsylvania); *Powell v. Drumheller,* 539 Pa. 484, 490, 653 A.2d 619, 622 (1995) ("[A] defendant is not relieved from liability because another concurring cause is also responsible for producing injury."). We also believe that the Fund's argument that the bath was merely routine and hygienic in nature because it fell outside of the prescription's timeframe is inconsistent with its position—with which we agree, as discussed above—that our review should focus primarily upon whether the health care provider's actions entailed the use of a medical skill attained through specialized training. It is not evident that this latter inquiry is substantially affected by whether or not the doctor's prescription was still in force at the time of the incident.

This leaves the question of whether the service actually provided by Chester Care implicated skills associated with special training. On this issue, we note initially that, although *Pistone* placed significant emphasis upon whether the skills applied were attained through rigorous intellectual training, as opposed to physical attainments, *see Pistone,* 555 Pa. at 620, 726 A.2d at 341 (quoting *Marx,* 157 N.W.2d at 871–72); *id.* at 621, 726 A.2d at 341–42 (quoting *Roe,* 587 N.E.2d at 217), this distinction was emphasized in the context of determining whether a sexual assault upon a patient could constitute medical malpractice. Because, however, there was no indication that the patient suffered from any significant mental

and/or functional impairment, *Pistone* did not present an ideal context in which to refine the standard in relation to a situation involving an individual who requires a more fundamental level of care due to such impairments. The present matter does provide an opportunity to elaborate upon these issues, as it is undisputed that Mrs. Barnes was totally debilitated by her condition, both mentally and physically, which necessarily altered the nature of the tasks performed on her behalf, and more specifically, the nature of the skill and the types of judgments necessary to perform them. The Fund's argument that Mr. Twyman simply used his physical strength to place Mrs. Barnes in the tub and take her out therefore leaves open the question of whether his failure to do any more than that amounted to professional negligence in the furnishing of medical services (here, nursing care).

We find that it did. It is uncontested that Mrs. Barnes was under the care of a nursing home licensed to provide health care or professional medical services at the time of the incident. In that setting she required specialized care for her skin condition as initially ordered by a doctor and as provided by a trained nurse's aide pursuant to a regimen that exceeded routine custodial care. Although the bath that Mrs. Barnes received departed from the doctor's orders in that it lacked a whirlpool component, the salient point for present purposes is that, while providing the bath, Chester Care's employees were delivering medical services in light of the overall circumstances concerning Mrs. Barnes' physical and mental infirmities. Bathing a completely incapacitated individual requires a certain degree of specialized training that might be unnecessary for the bathing of an ordinary elderly patient. For example, it requires the exercise of professional judgment as to considerations such as when and how frequently to check the water temperature, whether a person in Mrs. Barnes' condition would be able to remove herself from the tub if the water became too hot, and whether there was any likelihood of any other mishap such as drowning. Administering a bath under these circumstances therefore falls outside the scope of general custodial care which can be performed adequately by

an untrained employee. In sum, it constitutes the furnishing of a medical service which can lead to professional liability for purposes of the Malpractice Act.

Accordingly, the order of the Commonwealth Court granting summary judgment in favor of Appellees is affirmed.

Justices NEWMAN, EAKIN and BAER join in the opinion.

Former Justice NIGRO did not participate in the decision of this case.

Chief Justice CAPPY files a dissenting opinion in which Justice CASTILLE joins.

Chief Justice CAPPY, dissenting.

I am able to join parts I and II of the Majority Opinion. Specifically, I agree with the Majority that in determining whether a service triggers coverage under the Medical Professional Liability Catastrophe Loss Fund (the "Fund"), a court "must focus on whether [the] service involved a medical skill (broadly understood as per [the Healthcare Services Malpractice Act's defined class of health care providers]) associated with specialized training." Maj. Op. 586 Pa. at 406, 894 A.2d at 740. With this focus in mind, however, it is my view that the bath given by Mr. Twyman to Ms. Barnes was not a service that triggered coverage under the Fund. I, therefore, would reverse the Commonwealth Court's order granting summary judgment in favor of Appellees. Accordingly, I respectfully dissent from part III of the Majority Opinion.

While I accept that the Court must determine whether the skill required to bathe Ms. Barnes properly constituted a medical skill associated with specialized training within the context presented in this case, *i.e.,* nursing home care, I nonetheless am unable to conclude that the set of skills necessary to perform this task equated to such a medical skill. Regardless of whether Ms. Barnes' physician prescribed the bath or whether, as a certified nursing assistant, Mr. Twyman received training in bathing persons in Ms. Barnes' condition, Mr. Twyman's deposition testimony clearly demonstrates that

the type of skill that was required to bathe Ms. Barnes on a daily basis was not a "medical skill," let alone a medical skill "associated with specialized training."

Mr. Twyman offered the following testimony regarding his duty to bathe Ms. Barnes:

[T]hey needed me to pick her up, put her in the bath, pick her up, take her out of the bath.

Plaintiffs' Reply Brief in Support of Motion for Partial Summary Judgment, Exhibit A. While the successful completion of these tasks certainly required the exercise of judgment as to considerations such as water temperature and water levels, I, unlike the Majority, cannot go as far as to classify the type of judgment necessary to bathe Ms. Barnes properly as "professional judgment." *See* Maj. Op. 586 Pa. at 409–10, 894 A.2d at 742. It is beyond dispute that the proper exercise of judgment was important to Ms. Barnes' safety. The importance of the proper exercise of judgment in bathing Ms. Barnes properly does not, however, transform this judgment into "professional judgment," the improper exercise of which would trigger coverage under the Fund.

As the Majority notes, the Legislature created the Fund to serve as "a contingency fund for the purpose of paying all awards, judgments and settlements for loss or damages against a health care provider ... as a consequence of any claim for *professional liability* . . . ." 40 P.S. § 1301.701(d) (emphasis added) (superseded). In my view, finding, as the Majority does, that the negligent giving of a bath, under the circumstances presented in this case, constitutes the improper provision of a medical service giving rise to Fund coverage stretches the scope of "professional liability" claims covered by the limited resources of the Fund beyond that which the Legislature intended.

For these reasons, I would reverse the Commonwealth Court's order granting summary judgment in favor of Appellees.

Justice CASTILLE joins in this dissenting opinion.