**JOHN XXIII HOME, Petitioner**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Sept. 18, 2009.

Decided Jan. 22, 2010.

Publication Ordered April 16, 2010.

Bruce G. Baron, Harrisburg, for petitioner.

Leonard W. Crumb, Sr. Asst. Counsel and Allen C. Warshaw, Chief Counsel, Harrisburg, for respondent.

BEFORE: COHN JUBELIRER, Judge, and BUTLER, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

John XXIII Home (Provider) petitions for review of the January 12, 2009 order of the Secretary of Public Welfare (Secretary) who, upon reconsideration, upheld the order of the Bureau of Hearings and Appeals (BHA) dated July 18, 2008. In its July 18, 2008 order, the BHA adopted the recommendation of an administrative law judge (ALJ) granting the Department of Public Welfare, Office of Medical Assistance Programs' (Department) Motion for Summary Judgment (Motion) and dismissing Provider's appeal from its placement in peer group 9 for the fiscal year 2004–2005. Provider asserts that the Secretary erred in affirming the grant of summary judgment because: (1) there was a genuine issue of material fact as to whether it was impossible for the Department to utilize its then-existing regulation at 55 Pa.Code § 1187.94(1)(i) to reclassify Provider into a new Metropolitan Statistical Area (MSA) and peer group 6; (2) certain of the Secretary's findings of fact were not supported by substantial evidence; and (3) the Secretary erred in relying on regulations, statutes, and an Amended State Plan for Medical Assistance (Amended State Plan) not yet in effect to support the grant of summary judgment.

Provider is a nursing facility with between 3 and 119 beds and participates in the Medical Assistance (MA) Program (MA Program). (ALJ's Recommendation, Findings of Fact (FOF) ¶¶ 10–11.) Pursuant to the Public Welfare Code (Code)[1] and the Department's regulations, nursing facilities that participate in the MA Program, such as Provider, are classified into mutually exclusive peer groups for the purposes of establishing, *inter alia*, prices, rates, and MA payments for a given fiscal year. *See* 55 Pa.Code §§ 1187.94–1187.97 (setting forth the manner in which nursing facilities are funded). A nursing facility's peer group placement depends upon: (1) whether it is a special rehabilitation facility

---

1. Act of June 13, 1967, P.L. 31, *as amended,* 62 P.S. §§ 101–1503.

or a hospital-based nursing facility;[2] (2) the number of beds in the facility; and (3) the MSA Group (A, B, C, or non–MSA) in which the nursing facility is located pursuant to the statistical data set forth by the federal Office of Management and Budget (OMB). 55 Pa.Code § 1187.94. For example, nursing facilities that are not special rehabilitation facilities or hospital-based nursing facilities, that have no more than 119 beds and are located in MSA Group B, are placed in peer group 6 for price- and rate-setting purposes. *Id.* Thus, the Department's placement of nursing facilities in peer groups depends upon how the OMB categorizes MSAs.

The OMB publishes official bulletins identifying, among other things, MSAs within the United States. In the OMB Bulletin No. 99–04 (Bulletin 99–04), the OMB classified MSAs into four levels based on population: Level A—areas with a population of one million or more; Level B—areas with a population of between 250,000 and 999,999; Level C—areas with a population of between 100,000 and 249,999; and Level D—areas with a population of less than 100,000. (Bulletin 99–04 at 1, R.R. at 1072a.) Bulletin 99–04 classifies Mercer County, Pennsylvania, in which Provider is located, as a Level C MSA. (Bulletin 99–04, Attachment at 44, R.R. at 1077a.) Based on Provider's MSA group classification and the number of beds it provides, Provider was placed in peer group 9 in accordance with the procedure set out in 55 Pa.Code § 1187.94(1)(iii).

In June 2003, OMB published Bulletin No. 03–04 (Bulletin 03–04), based on the 2000 census. Bulletin 03–04 reclassified Mercer County to the Youngstown–Warren–Boardman, OH–PA MSA (Youngstown MSA). (Bulletin 03–04, Attachment at 52, R.R. at 1091a.) However, Bulletin 03–04 revised the definitions of MSAs, stating that "[t]he 2000 standards do not provide for the categorization of the areas based on total population comparable to Levels A–D under the 1990 standards" as provided for in Bulletin 99–04. (Bulletin 03–04, Attachment at 4, R.R. at 1086a.) Instead, Bulletin 03–04 included, among others, the following classifications: (1) MSAs, areas with "at least one urbanized area of 50,000 or more population, plus adjacent territory that has a high degree of social and economic integration with the core as measured by commuting ties"; and (2) Micropolitan Statistical Areas, areas with "at least one urban cluster" with a population "of at least 10,000 but less than 50,000 . . . plus adjacent territory that has a high degree of social and economic integration with the core as measured by commuting ties." (Bulletin 03–04, Attachment at 2, R.R. at 1085a.) Although Bulletin 03–04 uses population to distinguish between Metropolitan and Micropolitan Statistical Areas, it does not, as Bulletin 99–04 did, subcategorize the MSAs into levels based on population. If Bulletin 03–04 had contained such subcategories and, if those categories were the same as listed in Bulletin 99–04, Mercer County would have been located in a Level B MSA. Under this classification, Provider would be placed in peer group 6 for price- and rate-setting purposes. Recognizing that some federal and state agencies use its statistical definitions in non-statistical programs, the OMB cautioned that its definitions should not be used to develop non-statistical programs "without full consideration of the effects of using these definitions for such purposes." (Bulletin 03–04 at 2, R.R. at 1083a.)

(FOF ¶ 11.)

---

**2.** Provider "is not a special rehabilitation facility or a hospital-based nursing facility."

Following the OMB's advice, the Department examined its existing regulations and the effect the new standards set forth in Bulletin 03–04 would have on those regulations, as well as on nursing facilities, to determine whether the Department would adopt the new MSA standards for classifying nursing facilities into peer groups. Specifically, the Department looked at subsections 1187.94(1)(i) and (iii), which read, in relevant part:

(1) Nursing facilities participating in the MA Program, except those nursing facilities that meet the definition of a special rehabilitation facility or hospital-based nursing facility, will be classified into 12 mutually exclusive groups based on MSA group classification and nursing facility certified bed complement.

(i) The Department will use the **most recent MSA group classification, as published by the [OMB]** on or before April 1 of each year, **to classify each nursing facility into one of three MSA groups** or one non-MSA group.

. . . .

(iii) The Department will classify each nursing facility into one of the following 12 peer groups:

| Peer Group # | MSA Group | # Beds |
| --- | --- | --- |
| . . . | | |
| 6 | B | 3-119 |
| . . . | | |
| 9 | C | 3-119 |
| . . . | | |

55 Pa.Code § 1187.94(1)(i), (iii) (1995) (found at 25 Pa. B. 4477, 4499 (1995)) (emphasis added). The Department concluded that, because the new standards established in Bulletin 03–04 eliminated the MSA group classifications, i.e., A, B, or C, Section 1187.94(1)(i) could not be applied as written and, therefore, it was required to amend that regulation to address how peer groups would be determined. 34 Pa. B. 1863–64 (2004).

The Department also compared the effect on nursing facilities if the Department used the new MSA categorization standards to determine peer groupings, i.e., moving nursing facilities, such as Provider, from one peer group to another peer group based on moving from one MSA to a different MSA or from a MSA to a Micropolitan Statistical Area, rather than the historic MSA categorizations set forth in Bulletin 99–04, i.e., maintaining the status quo. *Id.* Based on its analysis, the Department concluded that "a majority of nursing facility providers would be adversely affected (that is, the case-mix payment system would compute lower rates for the majority) if the Department were to adopt the new Federal MSA definitions." *Id.* Accordingly, on April 2, 2004, the Department announced its intent to publish proposed amendments to Section 1187.94(1)(i), effective for the fiscal year beginning July 1, 2004, that would retain the historic MSA classification set forth in Bulletin 99–04 and continue to classify each MA nursing facility as MSA A, B, C or non–MSA. The Department further indicated its intention to amend the Commonwealth's Title XIX State Plan provisions regarding the method by which peer groups are established under the case-mix payment system. *Id.* The Department requested public comment to its proposed amendments. *Id.*

In June 2004, the Department submitted its proposed Amended State Plan to the federal Department of Health & Human Services, Centers for Medicare & Medicaid Services (CMS) for approval. Like the proposed amendment to Section 1187.94(1)(i), the Amended State Plan indicated that the Department would establish peer groups based on the historic Bulletin 99–04 MSA group classifications in the fiscal year beginning July 1, 2004. (Letter from Secretary to Mary T. McSorely, Associate Regional Administrator of CMS

Region III Division of Medicaid and Children's Health, R.R. at 1124a–26a; Amended State Plan, R.R. at 1132–33a.) The Department stated that, in making this policy change, it was following the public process required by 42 U.S.C. § 1396a(a)(13)(A)[3] by publishing advance notice of its intent to amend the state plan, publishing notice of the proposed rulemaking in the Pennsylvania Bulletin, and seeking additional public review and comment on the policy change. After reviewing the Amended State Plan, CMS approved the State Plan Amendment on January 27, 2005, with an effective date of July 1, 2004. (Letter from Dennis G. Smith, Director for CMS, Center for Medicaid and State Operations, to Secretary (January 27, 2005), R.R. at 1131a–32a.)

On August 13, 2004, the Department gave notice of the proposed rulemaking that, if approved, would amend Section 1187.94(1)(i) beginning in the 2004–2005 fiscal year. 34 Pa. B. 4465 (2004). Like the prior notice, the August 13, 2004 notice: advised the public of the proposed amendment and the reasons behind the proposed amendment; set forth the amended regulation; and requested public comments. The Department accepted, considered, and responded to the comments. (Notice of Final–Form Rulemaking at 24–26, February 18, 2004, R.R. at 546a–66a; Notice of Final–Form Rulemaking at 7–12, December 13, 2004, R.R. at 588a–93; Notice of Final–Omitted Rulemaking at 7–28, July 12, 2005, R.R. at 620a–41a.) On March 25, 2005, the Department gave notice to nursing facilities

of its intent to change the MA payment rates for the 2004–2005 fiscal year, effective July 1, 2004, based on its assumption that the proposed amendment of Section 1187.94(1)(i) would "be adopted in final-form without further change." 35 Pa. B. 1939 (2005). This notice also stated that the new annual case-mix per diem payments for the 2004–2005 fiscal year for nursing facility providers and the Department's calculated adjusted quarterly rates for the July, October, January, and April quarters of the 2004–2005 fiscal year could be found on the Department's website. *Id.*

On July 7, 2005, the General Assembly enacted the Act of July 7, 2005, P.L. 177 (Act 42), which amended certain sections of the Code regarding the payment for nursing facility services under the MA Program effective immediately. Act 42 added paragraph (5) to Section 443.1 of the Code, 62 P.S. § 443.1, which provided:

(5) On or after July 1, 2004, and until such time as regulations are adopted pursuant to subclause (iii), payments to county and nonpublic nursing facilities certified to participate as providers under Title XIX of the Social Security Act for nursing facility services shall be calculated and made as specified in the department's regulations in effect on July 1, 2003, **except as may be otherwise required by:**

(i) **the Commonwealth's approved Title XIX Plan for nursing facility services [the Amended State Plan];**

---

**3.** This section requires, in pertinent part, a state agency to provide a public process for, *inter alia*, the determination of rates of payment under a state plan for nursing facilities under which: (1) the "proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published"; (2) interested

parties and "[s]tate residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications"; and (3) "final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published." 42 U.S.C. § 1396a(a)(13)(A).

**(ii) regulations promulgated by the department pursuant to section 454 [62 P.S. § 454]....;**

62 P.S. § 443.1(5) (2005) (emphasis added).[4] Act 42 also added Section 454 to the Code, which provides, in relevant part:

(b) ... notwithstanding any other provision of law, including section 814–A of [the Code], the [S]ecretary shall promulgate regulations pursuant to section 204(1)(iv) of the act of July 31, 1968 (P.L. 769, No. 240), referred to as the Commonwealth Documents Law, which shall, until December 31, 2005, be exempt from all of the following acts:

(1) Section 205 of the Commonwealth Documents Law.

(2) Section 204(b) of the act of October 15, 1980 (P.L. 950, No. 164), known as the "Commonwealth Attorneys Act."

(3) The act of June 25, 1982 (P.L. 633, No. 181), known as the "Regulatory Review Act."

62 P.S. § 454(b). On August 12, 2005, the Department adopted final-omitted rule making and ordered the amendment of Section 1187.94(1)(i), effective July 1, 2004, in accordance with Sections 443.1(5) and 454, subject to the approval of the Office of General Counsel and the Legislative Reference Bureau. 35 Pa. B. 4612 (2005). The amended Section 1187.94(1)(i) now provides:

Effective for rate setting periods commencing July 1, 2004, the Department will use the MSA group classification published by [OMB] in the OMB Bulletin No. 99–04 (relating to revised definitions of [MSAs] and guidance on uses of Metropolitan Area definitions), to classify each nursing facility into one of three MSA groups or one non-MSA group.

55 Pa.Code § 1187.94(1)(i). Section 1187.94(1)(iii) includes the same table as before the amendment and, with the exception of any nursing facility that changed its number of beds, the nursing facilities stayed within their original peer groups.

On October 22, 2005, the Department announced the "peer groups, peer group medians and peer group prices for," among others, general and county nursing facilities pursuant to "55 Pa.Code § 1187.95(a)(4) (relating to general principles for rate and price setting)" and "in accordance with 55 Pa.Code Chapter 1187 ... as amended at 35 Pa. B. 4612 (August 13, 2005)." 35 Pa. B. 5873 (2005). The Department also announced the final 2004–2005 fiscal year per diem rates and adjusted quarterly rates for the July, October, January, and April quarters of the 2004–2005 fiscal year, again calculated in accordance with the now amended Section 1187.94(1)(i). 35 Pa. B. 5872 (2005).

On April 25, 2005, after the Department announced its calculation of the new annual case-mix per diem rates in the Pennsylvania Bulletin on March 25, 2005, at 35 Pa. B. 1939 (2005), Provider "filed a Request

---

4. The General Assembly subsequently amended Section 443.1(5) in the Act of June 30, 2007, P.L. 49 (Act 16), to read:

After June 30, 2004, and before June 30, 2007, payments to county and nonpublic nursing facilities enrolled in the medical assistance program as providers of nursing facility services shall be calculated and made as specified in the department's regulations in effect on July 1, 2003, **except that if the Commonwealth's approved Title XIX State Plan for nursing facility services in effect for the period of July 1, 2004, through June 30, 2007, specifies a methodology for calculating county and nonpublic nursing facility payment rates that is different than the department's regulations in effect on July 1, 2003, the department shall follow the methodology in the Federally approved Title XIX State plan.**

62 P.S. § 443.1(5) (emphasis added). This amendment was immediately effective.

for Hearing and Notice of Appeal [ (Request) ] with the [BHA] ... disputing its continued classification in Peer Group 9 for Year 10," the 2004–2005 fiscal year. (FOF ¶¶ 1–2.) In the Request, Provider asserted that it should have been in peer group 6 because, pursuant to Bulletin 03–04, Mercer County was now located within the Youngstown MSA, which Provider asserted was a Level B MSA. Thereafter, Provider and the Department filed position papers with the BHA and engaged in discovery. (FOF ¶¶ 4–6.) On July 27, 2007, the Department filed its Motion, asserting that the relief requested by Provider, placement in peer group 6, was unavailable as a matter of law because, pursuant to the Amended Plan, Act 42, and Section 1187.94(1)(i), the Department was statutorily obligated to use Bulletin 99–04 to categorize Provider in peer group 9, and that peer groups are mutually exclusive. (FOF ¶ 7; Motion at ¶¶ 7–12.) Provider filed an answer opposing summary judgment. (FOF ¶ 9.)

The ALJ agreed with the Department that the "OMB's elimination of the three MSA Group levels made it impossible for the Department to apply the existing language of" Section 1187.94(1)(i) to classify nursing facilities into peer groups and that "the Department undertook the necessary steps" to resolve the problem by amending the State Plan and Section 1187.94(1)(i). (FOF ¶ 16.) The ALJ found that Act 42 and Act 16 required the Department to follow the methodology set forth in the Amended State Plan for setting rates in the 2004–2005 fiscal year. (FOF ¶ 23; ALJ's Recommendation at 9.) Based on the requirements of the Amended State Plan, Act 42, and Act 16, the ALJ found that the Department properly assigned Provider to MSA Level C and peer group 9. (FOF ¶ 27; ALJ's Recommendation at 9.) Finally, the ALJ found that Provider "failed to demonstrate that there is a genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report." (FOF ¶ 26.) Accordingly, the ALJ recommended that the Motion be granted and that Provider's appeal be dismissed. (ALJ op. at 9.) Provider appealed to the BHA, which adopted the ALJ's recommendation in its entirety. Provider requested reconsideration by the Secretary, who upheld the BHA's determination. Provider now petitions this Court for review.

This court has described the standard for summary judgment as follows:

Summary judgment may be granted only where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. "In making this assessment, we view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." The scope of review of an order granting summary judgment is plenary. The standard of review provides we reverse ... only where [the fact finder] committed an error of law or clearly abused its discretion. To the extent the issues before us are questions of law, our standard of review is *de novo....*

*Belden & Blake Corporation v. Department of Conservation and Natural Resources,* 600 Pa. 559, 564, 969 A.2d 528, 531 (2009) (citations omitted) (citing Pa. R.C.P. No. 1035.2(1)) (quoting *Payne v. Department of Corrections,* 582 Pa. 375, 383, 871 A.2d 795, 800 (2005)). The applicable "substantive law defines which facts are material" for the purposes of summary judgment. *Strine v. Commonwealth,* 586 Pa. 395, 402, 894 A.2d 733, 738 (2006).

■ Provider raises numerous allegations of error on the part of the Secretary in granting the Department's Motion. Provider first asserts that the Secretary erred in granting summary judgment because there is a genuine issue of material fact regarding whether the Department could adopt and use the standards set forth in Bulletin 03–04 to classify nursing facilities within its existing regulatory framework. According to Provider, because the Department was able to calculate the impact of the new standards on nursing facilities when it was considering whether to adopt the new standards or use the Bulletin 99–04 standards, it was not, as the Department claimed, impossible for it to apply the then-existing Section 1187.94(1)(i).

■ We disagree with Provider that the "impossibility" question raised here is a genuine issue of material fact that, if disputed, would preclude the grant of summary judgment. Instead, we conclude that this question involves the interpretation of former Section 1187.94(1)(i) in light of the OMB's apparent abandonment of the MSA Levels to classify MSAs by population. Specifically, the question here is whether the Department can assign a nursing facility to a MSA group based on the "most recent MSA group classification, as published by the [OMB]," 55 Pa.Code § 1187.94(1)(i) (1995), where the OMB no longer classifies MSAs into separate groups. This involves a determination of whether it is **legally** impossible for the Department to apply former Section 1187.94(1)(i) as it had in the past. Questions of statutory and regulatory interpretation are questions of law. *Lynnebrook*

*and Woodbrook Associates, L.P. v. Borough of Millersville*, 600 Pa. 108, 111 n. 2, 963 A.2d 1261, 1262 n. 2 (2008); *Davis v. Department of Public Welfare*, 776 A.2d 1026, 1029 (Pa.Cmwlth.2001). Accordingly, we conclude that there was no genuine issue of material fact that would preclude the grant of summary judgment here.

■ Provider next argues that Findings of Fact 14, 16, and 17 are not supported by substantial evidence but are, instead, based solely on the Department's rulemaking documents.[5] Again, we disagree.

Finding of Fact 14 states, in relevant part, "the OMB eliminated the use of the MSA group levels A, B and C that are specifically referenced in § 1187.94(1)(iii)." (FOF ¶ 14.) This finding of fact is supported by the OMB's statement in Bulletin 03–04 that "[t]he 2000 standards do not provide for the categorization of the areas based on total population comparable to Levels A–D under the 1990 standards," as provided for in Bulletin 99–04 and from the fact that Bulletin 03–04 does not, in fact, subcategorize MSAs based on population. (Bulletin 03–04, Attachment at 3, R.R. at 1086a.) Moreover, the Department submitted a subsequent OMB Bulletin that contains the same language as Bulletin 03–04 and does not subcategorize MSAs into levels based on population. (OMB Bulletin No. 06–01, Appendix at 3, R.R. at 1218a.) Accordingly, we conclude that this finding of fact is supported by substantial evidence.

■ Finding of Fact 16 provides, in pertinent part, "OMB's elimination of the three MSA Group levels made it impossi-

---

5. To the extent that Provider challenges Finding of Fact 26, which finds that Provider failed to demonstrate that there is a genuine issue of any material fact as to a necessary element of the cause of action or defense as being "plainly in error," (Provider's Br. at 12), we already have rejected Provider's argument that there was a genuine issue of material fact as to the impossibility of applying the new standards set forth in Bulletin 03–04 to the existing regulatory language.

ble for the Department to apply the [then-]existing language of 55 Pa.Code. § 1187.94(1) in classifying nursing facilities into peer groups." (FOF ¶ 16.) Finding of Fact 17 describes the Department's efforts to provide notice of "its intent to amend its State Plan ... and section 1187.94 in order to use the MSA group classification set forth in" Bulletin 99–04 effective the first day of the 2004–2005 fiscal year. (FOF ¶ 17.) Provider asserts that there is nothing in the record to support this finding:

> other than [the Department's] statements in its rule-making, which are contrary to [the Department's] position in its State Plan Amendment submission reflecting [the Department's] ability not only to apply the existing language of its regulations to implement the new OMB MSAs for price-setting, but to compute the fiscal impact on individual providers of doing so.

(Provider's Br. at 12.)

As stated above, the question regarding whether it was impossible for the Department to apply the then-existing language of Section 1187.94(1)(i) to classify nursing facilities into peer groups was a question of legal impossibility, not factual impossibility. Contrary to Provider's assertions, the Department's position in its Amended State Plan submission was that it was not **legally** possible to apply the existing legislation and that, after considering the ramifications of using the new standards set forth in Bulletin 03–04, the Department decided that it would continue to use the Bulletin 99–04 standards. (Letter from Secretary to Mary T. McSorely, R.R. at 1124a–26a; Amended State Plan, R.R. at

1133a.) This decision required the Department to amend Section 1187.94(1)(i) because it would no longer be using the most recent classifications set forth by the OMB Bulletin on or in effect on April 1 of that year. CMS approved the Amended State Plan requiring the Department to use the Bulletin 99–04 standards to maintain the status quo. Moreover, to the extent that Provider challenges Finding of Fact 17, there is abundant evidence in the record to support the finding of the efforts that the Department underwent to give proper notice of its intent to amend Section 1187.94(1)(i) and that the effective date of the amendment would be the first day of the 2004–2005 fiscal year, July 1, 2004, where the Department provided notice and requests for public comment in three different publications of the Pennsylvania Bulletin: 34 Pa. B. 1863–64 (2004), 34 Pa. B. 4465 (2004), and 35 Pa. B. 1939 (2005). Accordingly, we conclude that there is substantial evidence in the record to support these findings of fact.

■ Provider next contends that the Secretary erred as a matter of law by applying legal standards not effective for the period during which the Department was required to establish peer groups and peer group pricing for the 2004–2005 fiscal year. According to Provider, 55 Pa.Code § 1187.95(a) requires the Department to set peer groups and peer group prices during the second quarter of the calendar year prior to the fiscal year in which they are to be implemented.[6] Provider asserts that the peer groups and peer group pricing must be based on a facility's MSA level as of April 1 of the calendar year before

---

6. Section 1187.95(a) states that "[p]rices will be set prospectively on an annual basis during the second quarter of each calendar year and be in effect for the subsequent July 1 through June 30 period." 55 Pa.Code § 1187.95(a). Section 1187.95(a)(3) provides that "[i]f a nursing facility changes bed size or MSA group, the nursing facility will be reassigned from the peer group used for price setting to [the] peer group based on bed certification and MSA group as of April 1, for rate setting." 55 Pa.Code § 1187.95(a)(3).

the new fiscal year. Thus, Provider maintains that the Department was required to set the peer groups and peer group pricing for the 2004–2005 fiscal year based on Provider's MSA level as of April 1, 2004, **prior** to July 1, 2004. Provider argues that, because the express language of the amended Section 1187.94(1)(i), Act 42, and the Amended State Plan give the effective date as July 1, 2004, and does not expressly state the intent to apply the amendment retroactively, the obligation to use Bulletin 99–04 was not in effect during the second quarter, April 1, 2004 through June 30, 2004, when the Department was required to set the peer groups and peer group rates for the 2004–2005 fiscal year. Essentially, Provider argues that, prior to July 1, 2004, there was nothing in the Department's regulations, in the Code, or in the Amended State Plan that precluded the application of the MSA reclassifications set forth in Bulletin 03–04 to determine a nursing facility's MSA group.[7]

In response, the Department argues that it was legally obligated by Act 42 and the Amended State Plan to use the amended version of Section 1187.94(1)(i) to determine Provider's MSA group classification for the 2004–2005 fiscal year. The Department asserts that, pursuant to the amended version of Section 1187.94(1)(i), it was required to classify Provider using the MSA group classifications set forth in Bulletin 99–04 and that, under these standards, Provider was properly placed in peer group 9. According to the Department, Provider's arguments regarding the effective dates of the amended version of Section 1187.94(1)(i), Act 42, and the Amended State Plan, and that Section 1187.95(a) required the Department to use the unamended version of Section 1187.94(1)(i) and the Bulletin 03–04 standards to determine Provider's peer group, ignores the plain and unambiguous language of the regulation, Act 42, and the Amended State Plan. The Department further asserts that Provider's interpretation ignores the unambiguous intent of the Department to use the Bulletin 99–04 standards in the 2004–2005 fiscal year, the first fiscal year following OMB's announcement of the new standards, to maintain the status quo.

■■ We agree with the Department that the amended version of Section 1187.94(1)(i), Act 42, and the Amended State Plan are unambiguous and that, pursuant to the unambiguous language of those sources of authority, the Department did not err in using the classifications set forth in Bulletin 99–04 to assign Provider to peer group 9 for the 2004–2005 fiscal year.[8] "When the language of a statute or

---

**7.** Provider contends that there is no dispute that, during the second quarter of the 2004 calendar year, the Youngstown MSA "was classified in the OMB publications as a Level B MSA Group." (Provider's Br. at 15.) However, we reject Provider's claim because, during the second quarter of 2004, the OMB Bulletin in effect, Bulletin 03–04, **did not** classify MSAs into subcategories. Thus, there was no OMB-classified Level B MSA group in effect at that time.

**8.** Because we agree with the Department that the amended version of Section 1187.94(1)(i), Act 42, and the Amended State Plan are unambiguous, it is unnecessary for the Court to rely upon the principles of statutory construction to determine the Legislature's intent. However, even if we were to conclude that the language was ambiguous, we would defer to the Department's interpretation of that regulation because that interpretation: (1) is not clearly erroneous; and (2) is consistent with Act 42 and Section 454 of the Code in particular, which authorized the Department to promulgate regulations to establish provider payment rates and stated that the regulations "shall . . . specify the effective date for provider payment rates." 62 P.S. § 454(a). Ordinarily, the Court will defer to an agency's interpretation of regulatory text unless that interpretation is contrary to the plain mean-

regulation is plain and unambiguous and conveys a clear meaning, there is no occasion for resorting to the rules of construction and the statute or regulation must be given its plain and unambiguous meaning." *Children's Hospital of Philadelphia v. Department of Public Welfare,* 153 Pa. Cmwlth. 634, 621 A.2d 1230, 1232 (1993). Amended Section 1187.94(1)(i) provides, in relevant part, "Effective for rate setting periods **commencing July 1, 2004,** the Department will use the MSA group classification published by [the OMB] in the OMB Bulletin No. 99–04 ... to classify each nursing facility into one of three MSA groups or one non-MSA group." 55 Pa. Code § 1187.94(1)(i) (emphasis added). The General Assembly clearly stated in Act 42, and essentially repeated in Act 16's amendment to Section 443.1(5), that the Department should apply the regulations in effect as of July 1, 2003 (the beginning of the fiscal year prior to the 2004–2005 fiscal year) **"except as may be otherwise required** by: (i) the [Amended State Plan]; [and] (ii) regulations promulgated by the Department pursuant to section 454 [of the Code]." 62 P.S. § 443.1(5) (2005) (emphasis added).

It is evident that the General Assembly intended the standards set forth in the Amended State Plan, which are the same as those in the amended Section 1187.94(1)(i), and the regulations promulgated pursuant to Section 454 of the Code, which include the amendment to Section 1187.94(1)(i), to take precedence over any contrary regulations. Amended Section 1187.94(1)(i) and the Amended State Plan, approved by CMS with an effective date of July 1, 2004, require the Department to use the Bulletin 99–04 criteria to set the rates for nursing facilities beginning with the 2004–2005 fiscal year, the fiscal year in question here. Provider's assertion that, pursuant to Section 1187.95(a), the Department was required to use the Bulletin 03–04 standards and the unamended version of Section 1187.94(1)(i) to set the peer group pricing for the 2004–2005 fiscal year fails for two reasons. First, as already indicated, Bulletin 03–04 does not subcategorize MSAs into group levels; accordingly, it would not be legally possible for the Department to use the most recent MSA group classification to categorize nursing facilities into peer groups. Second, Provider's interpretation of Section 1187.95(a) is contrary to the requirements of the Amended State Plan and the amended version of Section 1187.94(1)(i), amended pursuant to Section 454 of the Code, a result that the General Assembly clearly did not intend to occur.[9]

ing, frustrates the legislative intent of the authorizing legislation, or is unwise or erroneous. *Davis v. Department of Public Welfare,* 776 A.2d 1026, 1029 (Pa.Cmwlth.2001).

9. Moreover, we note that, in amending Section 1187.94(1)(i), the Department did not reduce the amount of funding Provider received; rather, the Department maintained the status quo. In essence, what occurred here is that, based on the reclassification of Mercer County to the Youngstown MSA, Provider **expected** that it would receive an increase in funding. The Department examined the impact the new standards would have on all nursing facilities in Pennsylvania and determined that the majority of nursing facilities would recognize a reduction in funding, which would affect their ability to properly function. The Department, acting within its expertise, decided that such a result was not in the best interests of the citizens and amended the regulations to maintain the status quo. The General Assembly similarly recognized the negative consequences to nursing facilities and citizens that the new standards would impose, and it enacted Acts 42 and 16 to amend the Code to require that the regulations used to calculate peer group and peer group pricing beginning in the 2004–2005 fiscal year be consistent with the Amended State Plan, which, in turn, requires the use of the Bulletin 99–04 standards.

Because we conclude that the plain and unambiguous language of amended Section 1187.94(1)(i), Act 42, and the Amended State Plan required the Department, as a matter of law, to use the standards set forth in Bulletin 99–04 to categorize nursing facilities into peer groups for the rate setting periods commencing July 1, 2004, we hold that the Department did not err in placing Provider in peer group 9 for the 2004–2005 fiscal year based on the standards set forth in Bulletin 99–04. Accordingly, we conclude that the Secretary did not err in upholding the grant of summary judgment in favor of the Department, and we affirm the Secretary's order.

### *ORDER*

**NOW,** January 22, 2010, the order of the Secretary of Public Welfare in the above-captioned matter is hereby **AFFIRMED.**